******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRENNA M. SPENCER *v.* ROBERT B. SPENCER
(AC 38050)

DiPentima, C. J., and Mullins and Harper, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed from the judgment of the trial court, which denied the plaintiff's motions for contempt and granted the defendant's motion for modification and termination of alimony. The dissolution judgment provided that the defendant would pay the plaintiff periodic alimony until, inter alia, her cohabitation. After a change in the way the defendant was compensated allegedly caused a decrease in his income, he fell behind on his alimony payments, and the parties entered into a stipulated agreement. Thereafter, the plaintiff filed two motions for contempt in response to the defendant's failure to make alimony payments pursuant to the dissolution judgment and the stipulation. The defendant based his modification request on an allegedly substantial change in circumstances due to a decrease in his income and his termination request on the plaintiff's cohabitation with her boyfriend. In granting the defendant's request to terminate alimony, the court determined, inter alia, that the plaintiff began living with her boyfriend, who had been contributing to the household expenses, and that had altered the plaintiff's financial needs. In granting the defendant's request to modify alimony payable in the month immediately prior to the month in which the termination of alimony became effective, the court found a substantial change in the defendant's financial circumstances as a result of substantially reduced income. The plaintiff appealed to this court, claiming, inter alia, that the trial court improperly denied her motions for contempt and granted the defendant's motion to modify and terminate alimony. *Held*:

1. The trial court did not abuse its discretion in granting the defendant's motion as to the termination of alimony: the court properly interpreted the term "cohabitation" in the dissolution judgment as consistent with the requirements of the statute (§ 46b-86 [b]) providing that a court may terminate alimony upon a showing that the party receiving alimony is living with another person under circumstances that alters the financial needs of that party, and, contrary to the plaintiff's claim, the defendant was not required to present evidence that the plaintiff was engaged in a romantic or sexual relationship with the person with whom she was living; moreover, the trial court's finding that the plaintiff cohabitated within the meaning of § 46b-86 (b) was not clearly erroneous, as the plaintiff testified that she had been living with her boyfriend and that, as a result, her monthly rent payment was reduced; furthermore, the plaintiff could not prevail on her claim that the defendant had unclean hands on the basis of his allegedly wilful nonpayment of alimony, as the trial court properly determined that the defendant's nonpayment of alimony was excusable because his substantial decrease in income prevented him from making full and timely alimony payments.

2. The trial court did not abuse its discretion in modifying alimony: the court's finding that the defendant experienced a substantial change in his financial circumstances due to a reduction in his income was not clearly erroneous, as the evidence demonstrated that his income was substantially lower during the time for which he sought modification than at the time of the dissolution judgment, and, notwithstanding the plaintiff's claim to the contrary, the trial court properly determined that the defendant met his burden of proving that the compensation change to which he agreed with his business partner, which reduced his income, was not the result of neglect or culpable conduct; furthermore, even if this court assumed that the trial court improperly excluded relevant testimony as to whether the defendant's reduction in his income was due to his neglect or culpable conduct because he did not seek advice from an attorney or an accountant, as the plaintiff claimed, the plaintiff failed to demonstrate that this ruling was harmful and required reversal, as such testimony would have been cumulative of other evidence; moreover, the amount by which the trial court modified the defendant's

alimony obligation was proportionate to the decrease in his income and was based on that court's determination that the defendant was having trouble meeting his financial obligations during the period for which he sought a modification.

3. The trial court did not abuse its discretion in denying the plaintiff's motions for contempt; the court's determination that the defendant's nonpayment of alimony was not wilful was based on findings that were not clearly erroneous.

Argued March 13—officially released October 31, 2017

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Winslow, J.*, rendered judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the court, *Turner, J.*, issued certain orders in accordance with the parties' stipulation; subsequently, the court, *Sommer, J.*, granted the defendant's motion for modification and denied the plaintiff's motions for contempt and for counsel fees, and the plaintiff appealed to this court. *Affirmed.*

*Norman A. Roberts II*, with whom, on the brief, was *Tara C. Dugo*, for the appellant (plaintiff).

*James H. Lee*, for the appellee (defendant).

*Opinion*

MULLINS, J. The plaintiff, Brenna M. Spencer, appeals from the judgment of the trial court denying her motions for contempt and granting the motion for modification and termination of alimony filed by the defendant, Robert B. Spencer. On appeal, the plaintiff claims that the trial court erred in (1) terminating alimony on the basis of her cohabitation, (2) modifying alimony on the basis of a substantial change in the defendant's financial circumstances, and (3) denying her motion for contempt.[1] We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The court rendered a judgment of marital dissolution in accordance with the parties' agreement on April 7, 2011 (dissolution judgment). Article 3.1 of the dissolution judgment provides: "Commencing and effective May 1, 2011 through and including the payment due on April 1, 2017, the [defendant], during his lifetime, shall pay alimony to the [plaintiff], until her death, remarriage, civil union, cohabitation or April 1, 2017, whichever shall first occur, the sum of Five Thousand Dollars ($5,000.00) per month, which shall be paid one-half each on the first and fifteenth of each month."

Within a few months after the dissolution judgment, the defendant fell behind on his semimonthly alimony payments, prompting both parties to file motions concerning the defendant's alimony obligation. On her part, the plaintiff filed: (1) an August 11, 2011 pro se motion for contempt alleging that the defendant owed one semimonthly alimony payment of $2500, and (2) an October 26, 2011 motion for contempt alleging that the defendant had failed to make an unspecified number of alimony payments. The plaintiff's August 11, 2011 motion never was heard, and her October 26, 2011 motion was not heard until January 24, 2013. It appears that the court's inability to hear the former, as well as its delay in ruling on the latter, was caused by the parties' preoccupation with various discovery disputes. At around the same time that the plaintiff filed her two motions for contempt, the defendant filed a motion to modify alimony. The defendant subsequently withdrew that motion at some point before January 24, 2013.

When the plaintiff's October 26, 2011 motion for contempt was heard by the court on January 24, 2013, the parties entered into a stipulated agreement (January, 2013 stipulation) specifying that the defendant had an alimony arrearage of $22,000. Pursuant to the January, 2013 stipulation, the defendant agreed, inter alia, to (1) make an immediate payment of $2250 to the plaintiff, (2) pay the plaintiff $750 per month toward the arrearage, and (3) continue to make monthly alimony payments of $5000 pursuant to the dissolution judgment.

The court accepted the stipulated agreement and rendered judgment accordingly.

Soon after the January, 2013 stipulation, the defendant again fell behind on alimony payments and the stipulated arrearage. On May 14, 2013, the plaintiff filed a motion for contempt, alleging the defendant had failed to make several alimony payments and that his alimony arrearage totaled $27,250. Although the motion was continued by agreement, the record does not disclose whether the court ever heard the plaintiff's May 14, 2013 motion. On April 29, 2014, the plaintiff filed another motion for contempt, alleging that the defendant had failed to make several more alimony payments and that his alimony arrearage totaled $70,000. It is unclear from the record if the April 29, 2014 motion was continued, or if it ever was heard by the court. On September 12, 2014, the plaintiff filed another motion for contempt, alleging that the defendant had failed to make several more alimony payments and that his alimony arrearage totaled $91,700. It is unclear from the record if this motion was continued, or if it ever was heard by the court. On November 13, 2014, the plaintiff filed motions for contempt alleging that the defendant's alimony arrearage exceeded $94,000. The plaintiff's November 13, 2014 motions eventually were heard on January 21, 2015.

Like the plaintiff, the defendant, subsequent to the January, 2013 stipulation, filed additional motions concerning his alimony obligation. On July 30, 2013, the defendant filed a motion to modify alimony on the ground that "a substantial change in the circumstances in [his] business and how [he] is compensated . . . [caused] a decrease in [his] income." In a later filing called, "Defendant's Proposed Orders and Claims for Relief," the defendant clarified that he was requesting that alimony be reduced "to $0 per week" for the period between August 22, 2013 and September 30, 2013. The defendant subsequently amended[2] his July 30, 2013 motion to modify so that it also sought termination of alimony effective October 1, 2013. Specifically, he sought termination on the ground that the plaintiff began cohabitating with her boyfriend on October 1, 2013.

On January 21, 2015, the court held a consolidated hearing on the plaintiff's November 13, 2014 motions for contempt and the defendant's July 30, 2013 amended motion for modification and termination of alimony. Following that proceeding, the court granted the defendant's amended motion for modification and termination of alimony and denied the plaintiff's motions for contempt. With respect to its granting of the defendant's motion, the court terminated and modified the defendant's alimony obligation as follows. First, it terminated alimony effective October 1, 2013, concluding that the plaintiff began cohabitating with her boyfriend on that

date. Second, having terminated alimony, the court then determined that it could modify alimony only for the period between August 22, 2013 and September 30, 2013, the period for which the defendant expressly sought a modification. Third, it modified alimony only for the month of September, 2013, reducing that month's obligation from $5000 to $4000. Fourth, it found that the defendant's total arrearage was $31,550 and ordered the defendant to pay that arrearage in monthly installments of $1500. This appeal followed. Additional facts will be set forth as necessary.

I

TERMINATION OF ALIMONY

The plaintiff's first claim is that the trial court improperly terminated alimony on the ground that she began cohabitating with her boyfriend on October 1, 2013. This claim consists of two challenges to the court's termination of alimony, and we address each separately.

A

In her first challenge to the court's termination of alimony, the plaintiff argues that, under the parties' dissolution judgment, the plaintiff's cohabitation would terminate alimony only if it had "a romantic or sexual component . . . ." Because the defendant did not present any evidence that her cohabitation had "a romantic or sexual component," the plaintiff contends, the court erred in terminating alimony on the ground of cohabitation. We disagree.

The following additional facts and procedural history are relevant to our resolution of the plaintiff's first challenge to the court's termination of alimony. As explained previously, the dissolution judgment obligated the defendant to pay the plaintiff alimony "until her death, remarriage, civil union, *cohabitation* or April 1, 2017, whichever shall first occur . . . ." (Emphasis added.) At the hearing, the defendant called the plaintiff, who testified that she lived alone on the second floor of a two-family house from October 1, 2012 to September 30, 2013. The plaintiff paid $950 per month to rent the second floor of that house. On October 1, 2013, the plaintiff began residing with her "boyfriend" in a rented single-family house. Regarding her living arrangement with her boyfriend, the plaintiff testified that they share equally the cost of rent and utilities. Pursuant to that cost sharing arrangement, the plaintiff pays only $375 per month in rent.

The court heard argument from the parties regarding whether it should terminate alimony on the basis of cohabitation. A fair reading of the transcript reveals that, in the course of argument, the plaintiff's counsel suggested that the court should apply General Statutes § 46b-86 (b).[3] Specifically, the plaintiff's counsel stated: "[M]y recollection of the [dissolution judgment] is that it referenced [§ 46b-86 (b)], and whenever cohabitation

references the statute, our case law [provides] that the court has the authorities of the statute. . . . [Even if the dissolution judgment] doesn't specifically reference the statute . . . *I don't think it changes my argument because I think that absent the definition* [*of cohabitation in the dissolution judgment*] *. . . the case law says that the court is to use the definition as contained in the statute . . . .*" (Emphasis added.) The plaintiff's counsel also argued that a finding of cohabitation under § 46b-86 (b) does not *require* the court to *terminate* alimony. Rather, "the statute says that the court has the authority not just to terminate [alimony] but to exercise its discretion to modify, suspend, or terminate as the court deems appropriate."

Following oral argument on the motions, in its corrected memorandum of decision, the court terminated alimony on the ground of cohabitation. Specifically, the court based its termination on two findings: (1) "[t]he plaintiff has admitted that she began cohabitating with her boyfriend on or about October 1, 2013," and (2) "as a result of that cohabitation and the contribution[s] of [her boyfried] to the plaintiff's household expenses, the plaintiff's financial needs have been altered."

Additionally, in responding to the plaintiff's argument that § 46b-86 (b) permitted the court to modify or suspend alimony instead of terminating it, the court stated the following: "Once the fact of termination has been established, the final part of the inquiry is *the effective date* of that termination. Our case law clearly establishes that where, as here, the language of the decree provides for *remedies* separate from those contained in . . . § 46b-86 (b), the language of the decree controls. *Mihalyak* v. *Mihalyak*, 30 Conn. App. 516, 520–22, 620 A.2d 1327 (1993) . . . ." With respect to the *effective date* of termination, the court determined that the "alimony termination provision was automatic and self-executing upon cohabitation . . . . See also *Krichko* v. *Krichko*, 108 Conn. App. 644, 648–52, 948 A.2d 1092, cert. granted, 289 Conn. 913, 957 A.2d 877 (2008) (appeal withdrawn May 19, 2009)." Thus, it determined that alimony terminated on "September 30, 2013, the date [immediately preceding] the plaintiff's cohabitation."

With these additional facts in mind, we turn to our analysis of the plaintiff's first challenge to the court's termination of alimony. As previously explained, the crux of this challenge is that the court improperly construed the term "cohabitation" in the dissolution judgment as not requiring evidence of a romantic or sexual relationship and, furthermore, that the defendant presented insufficient evidence that the plaintiff's "cohabitation" with her boyfriend included a romantic or sexual relationship. We are not persuaded.

We begin with our standard of review. "The standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic

relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Emerick* v. *Emerick*, 170 Conn. App. 368, 378, 154 A.3d 1069 (2017).

With the appropriate standard of review in mind, we now outline the relevant legal principles governing the termination of alimony on the basis of an alimony obligee's cohabitation. "General Statutes § 46b-86 (b) is the so-called cohabitation statute, which was enacted [in 1978 five] years after § 46b-86 (a) to correct the injustice of making a party pay alimony when his or her ex-spouse is living with a [significant other], without marrying, to prevent the loss of support." (Footnote omitted; internal quotation marks omitted.) *Connolly* v. *Connolly*, 191 Conn. 468, 473–74, 464 A.2d 837 (1983).

Section 46b-86 (b) provides in relevant part that a court may "modify [a dissolution judgment] and suspend, reduce or terminate the payment of periodic alimony upon a showing that the party receiving the periodic alimony is living with another person under circumstances which the court finds should result in the modification, suspension, reduction or termination of alimony because the living arrangements cause such a change of circumstances as to alter the financial needs of that party. . . ."

Our Supreme Court has characterized § 46b-86 (b) as containing both a "definitional portion" and a "remedial aspect." *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 197, 112 A.3d 144 (2015). The "definitional portion" of the statute refers to how the legislature defines "cohabitation." (Internal quotation marks omitted.) See id., 198 n.11; *Fazio* v. *Fazio*, 162 Conn. App. 236, 240 n.1, cert. denied, 320 Conn. 922, 132 A.3d 1095 (2016). The "remedial aspect" refers to the equitable powers the statute permits the trial court to exercise upon making a finding of cohabitation. *Nation-Bailey* v. *Bailey*, supra, 195–97.

With respect to the definitional portion, "[s]ection

46b-86 (b) does not use the word cohabitation. The legislature instead chose the broader language of living with another person rather than cohabitation . . . . Because, however, living with another person without financial benefit did not establish sufficient reason to refashion an award of alimony under General Statutes § 46b-8[2], the legislature imposed the additional requirement that the party making alimony payments prove that the living arrangement has resulted in a change in circumstances that alters the financial needs of the alimony recipient. Therefore, this additional requirement, in effect, serves as a limitation. Pursuant to § 46b-86 (b), the nonmarital union must be one with attendant financial consequences before the trial court may alter an award of alimony." (Citation omitted; internal quotation marks omitted.) *DeMaria* v. *DeMaria*, 247 Conn. 715, 720, 724 A.2d 1088 (1999).

Thus, under § 46b-86 (b), "a finding of cohabitation requires that (1) the alimony recipient was living with another person and (2) the living arrangement caused a change of circumstances so as to alter the financial needs of the alimony recipient." *Fazio* v. *Fazio*, supra, 162 Conn. App. 240 n.1.

Regarding the remedial aspect of § 46b-86 (b), we previously outlined that the court has the authority to "modify . . .  suspend, reduce *or* terminate the payment of periodic alimony" upon making a finding of cohabitation. (Emphasis added.) General Statutes § 46b-86 (b). Section 46b-86 (b) is not the exclusive basis on which an obligor can seek termination of alimony due to the obligee's cohabitation, as an obligor can also seek such termination on the basis of the terms of a dissolution judgment. See, e.g., *Remillard* v. *Remillard*, 297 Conn. 345, 352–53, 999 A.2d 713 (2010). The issue of *determining which basis the defendant invokes for termination of alimony*, however, is conceptually distinct from the issue of *construing the termination provision of a dissolution judgment*. For instance, if a dissolution judgment incorporates expressly the definitional portion of § 46b-86 (b), the court will apply the statutory definition, even though the obligor has moved for termination pursuant to the agreement rather than § 46b-86 (b). See, e.g., *D'Ascanio* v. *D'Ascanio*, 237 Conn. 481, 484–86, 678 A.2d 469 (1996) (court applied definition of cohabitation in § 46b-86 (b) where obligor moved for modification pursuant to dissolution judgment providing that alimony would be reduced "in the event that . . . [obligee] . . . cohabitates, as defined by statute" [emphasis omitted]). Our Supreme Court has extended this principle even further, holding that a court properly applies the statutory definition of cohabitation *even where the dissolution judgment fails to incorporate that definition. DeMaria* v. *DeMaria*, supra, 247 Conn. 719–22.

A review of the factual circumstances of *DeMaria*

aids in our resolution of the plaintiff's claim. In *DeMaria*, the dissolution judgment neither defined " 'cohabitation' " nor referenced § 46-86 (b) or any other statute. Id., 717. Rather, it provided merely that "alimony shall terminate upon . . . the cohabitation by the [obligee] with an unrelated male . . . ." (Internal quotation marks omitted.) Id. When the obligor sought termination of alimony, he moved pursuant to the dissolution judgment, not § 46b-86 (b). Id., 717–18 n.3. The trial court denied the obligor's motion for termination of alimony on the ground that, although he proved that the obligee was living with another person, there was no evidence that that obligee's financial needs were altered by her living with another person. Id., 717–18.

On appeal to this court, the obligor in *DeMaria* argued that the trial court had improperly construed the term cohabitation as it was used in the dissolution judgment. Id., 718–19. In particular, he contended that he had moved for termination specifically pursuant to the dissolution judgment, which, unlike § 46b-86 (b), did not require him to prove that the obligee's cohabitation altered her financial circumstances. Id., 719. This court agreed with the obligor, and the obligee appealed to our Supreme Court.

In reversing this court's judgment, our Supreme Court in *DeMaria* first observed that "cohabit[ation]" was not defined in the dissolution judgment, and, therefore, "in deciding the . . . motion to terminate alimony, the trial court was left to construe the word." Id., 720. In construing "cohabitation," our Supreme Court stated that it was appropriate for the trial court to rely on § 46b-86 (b): "Although the definition of cohabitation as set forth in the dissolution judgment *is not controlled by § 46-86 (b)*, statutes are a useful source of policy for common-law adjudication, particularly when there is a close relationship between the statutory and common-law subject matters. . . . We consider this case to be a similarly appropriate instance to look to our statutes as a useful source of common-law policy and, therefore, consider the trial court's reliance upon § 46b-86 (b) as a definitional source to have been a proper exercise of its authority." (Citations omitted; emphasis added.) Id., 721–22. Accordingly, the court concluded that "as a matter of common-law adjudication, the trial court was guided properly by the statute. . . . Nothing in . . . any . . . case that we have examined, precludes an interpretation of cohabitation that is consistent with the considerations expressed by the legislature in § 46b-86 (b). Indeed, we have found no principled reason to reject such an interpretation of cohabitation." (Citations omitted.) Id., 722.

With the relevant legal principles in mind, we turn to the present case. In the present case, our reading of the court's corrected memorandum of decision leads us to conclude that it interpreted "cohabitation" in the

dissolution judgment as consistent with the two require-
ments of § 46b-86 (b). Three reasons support this con-
clusion.

First, like the trial court in *DeMaria*, the trial court
in the present case determined that only two factors
controlled its cohabitation analysis. Those two factors
are the two requirements imposed by § 46b-86 (b). In the
present case, the court based its decision to terminate
alimony on only two findings: (1) the plaintiff admitted
that she began "cohabitating with her boyfriend"; and
(2) the plaintiff's cohabitation altered her financial
needs. The first finding, although formulated in terms
of "cohabitating," refers to the first requirement
imposed by § 46b-86 (b) that the obligee live with
another person. See, e.g., *Gervais* v. *Gervais*, 91 Conn.
App. 840, 854, 882 A.2d 731 (referring to first require-
ment of § 46b-86 [b] as "cohabitation"), cert. denied,
276 Conn. 919, 888 A.2d 88 (2005). The second finding
unequivocally refers to the second requirement of § 46b-
86 (b) that the obligee's financial needs have been
altered. Thus, the trial court effectively determined that
the two requirements of § 46b-86 (b) were the exclusive
considerations in its analysis of cohabitation.

Second, as previously set forth in considerable detail,
a fair reading of the transcript of the trial court hearing
reveals that the plaintiff's counsel suggested that the
court should apply § 46b-86 (b). In particular, counsel
argued that the definition of cohabitation found in
§ 46b-86 (b) applies even to dissolution judgments that
do not incorporate that definition. In light of this sugges-
tion, and the court's corrected memorandum of deci-
sion, we are convinced that the trial court in fact applied
the statutory definition of cohabitation.

Third, we do not believe that the court's statement
that "the language of the decree controls" is inconsis-
tent with its application of the definition of cohabitation
in § 46b-86 (b). Rather, in making that statement, the
court was addressing whether the dissolution judgment
incorporated that statute's *remedial aspect*, not
whether that statute's definitional portion is applicable.
See *Nation-Bailey* v. *Bailey*, supra, 316 Conn. 197. To
be sure, as the court correctly pointed out, "where
. . . the language of the decree provides for *remedies*
separate from those contained in . . . § 46b-86 (b), the
language of the decree controls." (Emphasis added.) In
other words, the court had to determine if the dissolu-
tion judgment required it to terminate alimony upon a
finding of cohabitation, or if it had the discretion to
modify or suspend alimony pursuant to the statute.
The court ultimately concluded that it was obligated to
terminate alimony because the dissolution judgment
unambiguously provided that the "alimony termination
provision was automatic and self-executing upon
cohabitation . . . ." Thus, it appears that the court con-
cluded that the dissolution judgment was consistent

with § 46b-86 (b) with respect to that statute's definitional portion, but it was inconsistent with that statute with respect to the statute's remedial aspect.[4]

Having concluded that the trial court interpreted the term "cohabitation" in the dissolution judgment as consistent with § 46b-86 (b), we must determine whether that was a proper interpretation. As previously explained, our Supreme Court has held that it is appropriate for a trial court to apply the statutory definition of cohabitation to a dissolution judgment that neither defines "cohabitation" nor references the statute. Thus, we are aware of no principled basis for deviating from that rule in the present case, in which the dissolution judgment neither defines "cohabitation" nor references § 46b-86 (b) or any other statute. Accordingly, because the definition of cohabitation in § 46b-86 (b) has only two elements, neither of which is evidence of a romantic or sexual relationship, the defendant was not required, pursuant to the dissolution judgment, to present evidence of a romantic or sexual relationship.[5]

Our conclusion that the trial court properly construed the term cohabitation does not end our analysis. Rather, we still must determine whether it was clearly erroneous for the court to find that the plaintiff cohabited within the meaning of § 46b-86 (b). On the basis of the record before us, we have no difficulty concluding that this finding is not clearly erroneous because there is ample evidence to support it, and we are without the definite and firm conviction that a mistake has been committed. Specifically, the plaintiff's own testimony established that she began living with her boyfriend and that, as a result of that living arrangement, her monthly rent obligations were reduced from $950 to $375. Thus, there was clear evidence of the two requirements imposed by the definition of cohabitation in § 46b-86 (b). Accordingly, we conclude that the trial court's termination of alimony was not an abuse of discretion.

B

The plaintiff's second challenge to the court's termination of alimony is that termination was improper because the defendant had unclean hands. Specifically, the plaintiff argues that the defendant's "wilful" and "culpable" nonpayment of alimony caused the plaintiff to cohabit with her boyfriend. We disagree.

The following additional facts and procedural history are relevant to our resolution of the plaintiff's claim. The plaintiff testified that, before moving in with her boyfriend in October, 2013, she had lived by herself on the second floor of a Holyoke, Massachusetts, home from October 1, 2012 to September 30, 2013. At the time she rented the Holyoke home, she was employed and earning approximately $15 per hour. On October 1, 2013, she moved from the Holyoke home to a home

her boyfriend was renting because she could no longer afford the rent for the Holyoke home. According to the plaintiff, the reason she could not afford the rent for the Holyoke home was that the defendant was not making timely and full alimony payments.

Regarding the defendant's failure to make timely alimony payments, the plaintiff presented evidence that the defendant's total alimony obligation from the time of the dissolution judgment, April, 2011, to the time of her cohabitation, October 1, 2013, was $144,000. When her cohabitation began, according to the plaintiff's evidence, the defendant had paid approximately $114,950 of that $144,000 obligation, $31,950 of which was paid between the January, 2013 stipulation and October 1, 2013. Further evidence relating to the defendant's partial and sporadic payment of alimony during that period was provided in the defendant's testimony. Specifically, the defendant testified that a substantial decrease in income prevented him from making full and consistent alimony payments in 2013, that his reduced income also frustrated his ability to meet other financial obligations, including his mortgage, living expenses, taxes, legal fees, and childcare costs, and that he ultimately borrowed from his 401 (K) retirement account and the overdraft feature on his checking account to pay alimony and to meet his other financial obligations.

As we explain in parts II and III of this opinion, the court, in its corrected memorandum of decision, credited the defendant's testimony. Crucially, it credited the part of his testimony that a substantial decrease in his income prevented him from making full and timely alimony payments and from satisfying his other financial liabilities. In so crediting the defendant's testimony, the court refused to find the defendant in contempt for his nonpayment of alimony: "With respect to the plaintiff's motions for contempt, the court also concludes that the defendant attempted to pay the alimony and the prior arrearage, despite falling behind due to his decreased income, by drawing from his retirement account and other assets. The plaintiff has failed to sustain her burden for a finding of contempt . . . ."

With these additional facts in mind, we turn to our analysis of the plaintiff's second challenge to the court's termination of alimony. The plaintiff has not identified any specific legal doctrine, other than unclean hands, that purportedly precludes the termination of alimony on the basis of cohabitation when the cohabitation allegedly was caused by the obligor's "wilful" or "culpable" conduct. Even if we assume, without concluding, that unclean hands or some other unspecified doctrine affords such relief, the record does not support the plaintiff's claim that the defendant's nonpayment of alimony was "wilful" or "culpable."

Having invoked specifically the doctrine of unclean hands, the plaintiff's claim requires us to set forth a

critical requirement imposed by that doctrine. That is, like a claim of contempt, a claim of unclean hands will not lie unless the alleged misconduct is *wilful*. See, e.g., *Bauer* v. *Bauer*, 173 Conn. App. 595, 600, 164 A.3d 796 (2017) ("To constitute contempt, a party's conduct must be *wilful*. . . . *Noncompliance alone* will not support a judgment of contempt." [Emphasis added; internal quotation marks omitted.]); *Bank of America, N.A.* v. *Aubut*, 167 Conn. App. 347, 380, 143 A.3d 638 (2016) ("[t]he party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in *wilful* misconduct with regard to the matter in litigation" [emphasis added; internal quotation marks omitted]).

Our review of the record leads us to conclude that the plaintiff failed to meet her burden of proving that the defendant's nonpayment of alimony was wilful. Indeed, as we explain in greater detail in part III of this opinion, in refusing to find the defendant in contempt, the trial court properly determined that the defendant's nonpayment was excusable. In making this determination, the court credited the defendant's testimony that the substantial decrease in his income and the attendant financial hardship prevented him from making full and timely alimony payments, and that he made efforts to make some partial alimony payments despite the substantial decrease in income and financial hardship.[6] Accordingly, having failed to prove that the defendant's nonpayment of alimony was wilful, the plaintiff's second challenge to the termination of alimony must fail.

## II

## MODIFICATION OF ALIMONY

The plaintiff's second claim is that the court improperly modified alimony on the basis of a substantial change in the defendant's financial circumstances. Having concluded in part I of this opinion that the court properly terminated alimony effective October 1, 2013, our analysis of the plaintiff's second claim is confined to the month of September, 2013, which is the only period for which the court modified alimony. The plaintiff's second claim consists of four challenges, which we address separately.

### A

The plaintiff's first challenge to the court's modification of alimony is that it was clearly erroneous for the court to find that the defendant experienced a substantial change in his financial circumstances. We disagree.

The following additional facts and procedural history are necessary to our resolution of the plaintiff's second claim. At the hearing, the defendant presented testimonial and documentary evidence in support of his claim that he experienced a substantial decrease in income when he filed his July 30, 2013 motion to modify. The defendant testified that the decrease was due to a

change in the way in which he was compensated by the company in which he held a partnership interest. Specifically, prior to 2013, he and the company's only other partner split the partnership's yearly profits equally, regardless of how much revenue each of them generated for the partnership. Beginning in 2013, however, the partnership switched to a commission based compensation model, pursuant to which the defendant's compensation was based on how much sales revenue he personally generated.

As a result of the change in the partnership's compensation scheme, the defendant's adjusted gross income in 2013, the year in which he sought a modification of alimony, was less than his adjusted gross income in 2011, the year in which the parties' marriage was dissolved. The defendant's federal income tax returns, which were admitted at the hearing as exhibits, indicated that his 2011 adjusted gross income was $121,743 and that his 2013 adjusted gross income was $82,507. The defendant provided testimony, corroborated by his bank statements, that his company's new compensation scheme caused there to be months in 2013 in which he did not receive any payments from the company.

In addition to frustrating his ability to make timely alimony payments, the decrease in the defendant's income had other financial consequences. Specifically, the defendant testified that he was unable to pay his federal income tax liability for the years of 2010, 2012, and 2013, that a lien had been placed on his home, that he was five months behind on mortgage payments, and that he had borrowed funds from his 401 (K) retirement account to cover bills and expenses.

In its corrected memorandum of decision, the trial court found that "prior to August, 2013, the defendant's income had been substantially reduced . . . . [T]he defendant's substantial income reduction occurred shortly before the plaintiff's . . . cohabitation terminated his ongoing alimony obligation." Thus, the court ordered that "alimony . . . [be] reduced to $4000 for September, 2013, the period between when [the defendant] had zero draws and the termination of alimony as a result of plaintiff's cohabitation." In finding a substantial change in the defendant's financial circumstances, the court reasoned as follows: "There is no dispute that the defendant's income as of 2013 is significantly lower than it was previously, in particular, as reflected on his 2011 and 2012 income tax returns."

With these additional facts in mind, we begin our analysis of the plaintiff's first challenge to the court's modification of alimony by outlining the pertinent legal principles. "Our review of a trial court's granting or denial of a motion for modification of alimony is governed by the abuse of discretion standard. . . . To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings

were clearly erroneous. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Trial courts have broad discretion in deciding motions for modification." (Citation omitted; internal quotation marks omitted.) *Light* v. *Grimes*, 156 Conn. App. 53, 64, 111 A.3d 551 (2015).

"Modification of alimony is governed by [§ 46b-86 (a)] which provides in relevant part: Unless and to the extent that the decree precludes modification . . . an order for alimony . . . may at any time thereafter be . . . altered or modified . . . upon a showing of a substantial change in the circumstances of either party . . . . As the party seeking modification, the defendant ha[s] the burden of proving a substantial change in circumstances. . . .

"We previously have explained the specific method by which a trial court should proceed with a motion brought pursuant to § 46b-86 (a). When presented with a motion for modification, a court must first determine whether there has been a substantial change in the financial circumstances of one or both of the parties. . . . Second, if the court finds a substantial change in circumstances, it may properly consider the motion and, on the basis of the . . . § 46b-82 criteria, make an order for modification. . . . The court has the authority to issue a modification only if it conforms the order to the distinct and definite changes in the circumstances of the parties. . . . Simply put, before the court may modify an alimony award pursuant to § 46b-86, it must make a threshold finding of a substantial change in circumstances with respect to one of the parties." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Schade* v. *Schade*, 110 Conn. App. 57, 62–63, 954 A.2d 846, cert. denied, 289 Conn. 945, 959 A.2d 1009 (2008). A finding of a substantial change in circumstances is subject to the clearly erroneous standard of review. See, e.g., *O'Donnell* v. *Bozzuti*, 148 Conn. App. 80, 89, 84 A.3d 479 (2014). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Perricone* v. *Perricone*, 292 Conn. 187, 209, 972 A.2d 666 (2009).

Generally, "[i]n considering a motion to modify or terminate an alimony or support order pursuant to § 46b-86, the court is limited to a *comparison between the current conditions and the last court order*." (Emphasis added; internal quotation marks omitted.) *Robinson* v. *Robinson*, 172 Conn. App. 393, 401, 160 A.3d 376, cert. denied, 326 Conn. 921,     A.3d (2017). If a postjudgment order merely reaffirms the dissolution judgment's original alimony order, however,

the court must compare the current conditions to the conditions *existing at the time of the dissolution judgment.* See *Demartino* v. *Demartino*, 79 Conn. App. 488, 495–96, 830 A.2d 394 (2003) ("Because the 1991 order did not modify alimony, but instead merely denied the motion for modification and maintained the alimony award, the appropriate order was the original order of periodic alimony contained within the judgment of dissolution in 1982. To determine properly whether there had been a substantial change in circumstances, the court would have been required to compare the parties' financial circumstances as they existed in 1982 to the parties' financial circumstances as they existed [when the motion for modification was filed] in 2002.").

Having outlined the relevant law, we proceed to an analysis of the plaintiff's claim. The trial court found that the defendant experienced a substantial change in his financial circumstances in 2013 due to a reduction in his income. Our review of the record leads us to conclude that this finding is not clearly erroneous.

Testimonial and documentary evidence was presented that the defendant's income in 2013 was substantially lower than his income at the time of the 2011 dissolution judgment.[7] Specifically, the defendant provided testimony, which was corroborated by his federal tax returns, that his monthly net income was $10,145.25 in 2011 and $6875.58 in 2013. Moreover, the defendant testified that, as a result of this reduction in income, he had difficulty paying alimony and meeting his other financial obligations. The court was free to credit this evidence and assign to it whatever weight it deemed appropriate. See, e.g., *Zilkha* v. *Zilkha*, 167 Conn. App. 480, 487–88, 144 A.3d 447 (2016) ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" [internal quotation marks omitted]). This court previously has held that an income reduction of similar magnitude can constitute a substantial change in circumstances. See, e.g., *Arena* v. *Arena*, 92 Conn. App. 463, 467–68, 885 A.2d 765 (2005) (trial court properly found substantial change in circumstances where obligor's annual income decreased from $200,000 to $145,000).

Accordingly, we conclude that the trial court's finding that there was a substantial change in circumstances is not clearly erroneous because there is evidence to support it, and we are without the definite and firm conviction that a mistake has been committed.

### B

The plaintiff's second challenge to the court's modification of alimony is that the court improperly determined that the substantial change in circumstances was not caused by the defendant's own neglect or culpable

conduct. We disagree.[8]

The following additional facts and procedural history are relevant to our resolution of the plaintiff's second challenge to the court's modification of alimony. As previously explained, the defendant testified that the reduction in his income resulted from a change in the way that he is compensated by the company in which he holds a partnership interest. The defendant's company is in the business of reselling video broadcasting equipment. The defendant and his business partner, Clifford Allen, are the company's only partners and employees. The defendant's role in the company differs slightly from Allen's role. Allen is responsible primarily for sales, while the defendant does consulting, design, deployment, and installation. From 2005 to 2013, Allen and the defendant shared the company's profits equally, regardless of how much sales revenue each of them generated. While this compensation scheme was in effect, Allen and the defendant generated varying amounts of sales revenue, but the defendant was the principal revenue generator.

In 2013, the defendant's company switched to a commission based compensation scheme whereby each partner receives remuneration only for sales that he generates. According to the defendant, the change in the compensation structure was initiated unilaterally by Allen; the defendant was not involved in the decision at all. When the defendant's sales revenue began to decline in 2013, Allen told the defendant that he would force him out of the company if he did not agree to the new compensation scheme. According to the defendant, the following factors had contributed to the decline in his sales revenue: (1) "changes in technology"; (2) "a much more competitive marketplace"; and (3) "influences outside the company," including his devotion of more time to childrearing. The defendant testified regarding the efforts he made, under the new compensation scheme, to increase his sales revenue by expanding his client base. Specifically, the defendant has "ma[de] more outgoing calls to clients to increase their interest in the [company's] technologies . . . participat[ed] in marketing programs with . . . the manufacturers that [produce his company's products]," and attempted to secure "referral business through . . . existing customers."

The defendant testified that he believed that he had no other alternative but to accept the compensation change so he could remain with the company. He "remained with the company in the hope that things might change in the future because [he] needed to have a job and insurance to take care of [his children]." The defendant reasoned that starting *another* company would be the only alternative to remaining with his current company that would have "the same kind of income potential." Starting another company, however,

was not a viable option because the defendant lacked "[s]eed money . . . to start a company [and] credit." The defendant's financial affidavit, which was admitted at the hearing as an exhibit, also revealed that, as of December 31, 2013, there was a $93,436 deficit in the defendant's capital account in the company.

The defendant was cross-examined thoroughly about the change to his company's compensation scheme. The defendant denied that the change was the result of a "negotiation" between Allen and him. Rather, the change, as characterized by the defendant, was the result of being "given [the] choice of either . . . accepting [the compensation change] or leav[ing] the company." When asked by the plaintiff's counsel if he had sought advice from either a lawyer or an independent accountant regarding whether Allen could force him out of the company in this manner, the defendant answered in the negative. The defendant further testified that he did not have any money to pay for the cost of seeking such advice.

In its corrected memorandum of decision, the court credited the defendant's testimony that the change in his company's compensation scheme was not voluntary. Thus, it found that "the evidence does not support any conclusion that the decrease in income was due to voluntary or culpable conduct by the defendant." In so finding, the court reasoned that "[i]t was not unreasonable for [Allen] to insist that they each draw income from [the defendant's company] based on the amount of business they [each] generate[d]."

With these additional relevant facts in mind, we turn to our analysis of the plaintiff's second challenge to the court's modification of alimony. We begin by setting forth the relevant law. "[T]o qualify as a substantial change in circumstances, a change or alleged inability to pay must be excusable and not brought about by the defendant's own fault. . . . Thus, a mere [i]nability to pay does not automatically entitle a party to a decrease of [a support] order. . . . The moving party must show that the alleged change in circumstances is excusable and not brought about by the defendant's own fault, such as through the moving party's own extravagance, neglect, misconduct or other unacceptable reason . . . ." (Citations omitted; internal quotation marks omitted.) *Zilkha* v. *Zilkha*, supra, 167 Conn. App. 488–89; see id., 485–90 (trial court did not abuse its discretion by denying obligor's motion to modify alimony because alleged decrease in obligor's earning capacity was caused by his culpable conduct, which consisted of violations of federal security laws and perpetration of domestic violence). In determining whether the evidence establishes a substantial change in circumstances, "the [trial] court [is] free to credit or reject all or part of the testimony given . . . . On review, we do not reexamine the court's credibility assessments."

Id., 490.

Here, as explained previously, the trial court credited the defendant's testimony that he could not resist the change to his company's compensation scheme. Specifically, it credited the defendant's assertion that Allen gave him an ultimatum that put him squarely in a dilemma. That is, the defendant could either accede to the change to the compensation scheme or leave the company. On the basis of the record before us, we conclude that the trial court properly determined that the defendant's accession to the compensation change was not the result of neglect or other culpable conduct. Specifically, the record reveals that the defendant had begun to experience a decline in sales revenue in 2013 due to a multitude of factors beyond his control. Rather than leave the company for which he worked and in which he was a partner since 2005, the defendant chose to stay with the company and attempt to rehabilitate his declining sales revenue. In so choosing, the defendant reasonably determined that staying with the company was preferable to the uncertainty of leaving it for another opportunity. The reasonableness of this choice is underscored by the fact that the defendant did not have the requisite capital or credit to start a new business and that he preferred to maintain some income so he could meet his financial obligations, including his mortgage and childcare expenses. Accordingly, we conclude that the court properly determined that the change in the defendant's financial circumstances was not caused by his own neglect or culpable conduct.

The plaintiff argues that what the defendant characterizes as the dilemma of either agreeing to the compensation change or leaving the company actually was a false dilemma. According to the plaintiff, the defendant had a third option, namely, challenging his business partner's authority to make him agree to the compensation change or leave the company. The plaintiff contends that, by admittedly not seeking expert legal or accounting advice regarding whether he could avail himself of this third option, the defendant failed to exercise due diligence. We are not persuaded by this argument because it focuses too narrowly on general notions of legal and accounting principles at the cost of disregarding the specific practical circumstances surrounding the defendant's situation.

As an initial matter, we reiterate that implicit in the defendant's decision to remain with the company was the reasonable determination that this decision was preferable to the uncertainty of seeking other employment. Likewise, it also would be reasonable to determine that remaining with the company was preferable to the uncertainty of resolving, and possibly litigating, a partnership dispute. Moreover, the record amply demonstrated that the defendant did not need expert legal or accounting advice to surmise that his business part-

ner had leverage over him. In other words, regardless of what the principles of partnership law and accounting dictate, the defendant was not necessarily in a position *practically* to oppose the compensation change. This is especially true in light of the facts that the defendant's income began to decline relative to his business partner's, his capital account in the company contained a substantial negative balance, he needed to maintain some level of income to meet his financial obligations, and he lacked the capital and credit to start another company.

In light of the foregoing, we conclude that the court properly determined that the defendant met his burden of proving that the change in his financial circumstances was not caused by his own neglect or culpable conduct.

C

The plaintiff's third challenge to the court's modification of alimony purports to be a claim that the court applied the wrong legal standard.[9] In actuality, this challenge merely states a garden variety evidentiary claim, namely, that the court improperly excluded relevant testimony as to whether the reduction in his income was due to his neglect or culpable conduct. We are not persuaded by this evidentiary claim.

The following additional facts and procedural history are necessary to our resolution of the plaintiff's third challenge to the court's modification of alimony. As previously set forth in part II B of this opinion, part of the plaintiff's strategy was to establish that the defendant did not prove that the change in his financial circumstances was not due to his own neglect or culpable conduct. Pursuant to this strategy, the plaintiff sought to inquire whether the defendant exercised due diligence in deciding to accede to his business partner's demand that they change the company's compensation scheme. Specifically, she asked the defendant, without objection, whether he sought advice from a legal or accounting expert regarding his business partner's demand. The defendant answered that he had not sought such advice. The plaintiff then attempted to ask the defendant the following question: "Did you do a Google search to find out whether or not the ultimatum that was put to you about being forced out or accepting less was viable?" In response to the question, the defendant raised an objection, which was sustained by the court. In sustaining the objection, the court stated, inter alia, that it "has permitted cross-examination on this topic. The plaintiff's counsel has asked a number of times questions related to whether [the defendant] sought other advice whether it was legal, whether it was accounting . . . ."

With those additional relevant facts in mind, we now analyze the defendant's third challenge to the court's modification of alimony. We begin by setting forth the

relevant law. "[Our Supreme Court has] held generally that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, *he or she has the burden of demonstrating that the error was harmful*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580, 804 A.2d 795 (2002); see also *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 128, 956 A.2d 1145 (2008) ("Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." [Internal quotation marks omitted.]).

"A determination of harm requires [this court] to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. . . . Thus, our analysis [would include] a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence *is merely cumulative of other validly admitted testimony*. . . . The overriding question [we must answer] is whether the trial court's improper ruling affected the [fact finder's] perception of the remaining evidence." (Citations omitted; emphasis added; internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 489–90, 927 A.2d 880 (2007). "It is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 364, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

Having outlined the relevant legal principles, we turn to the present case. Even if we assume, without deciding, that the challenged evidentiary ruling was improper, the plaintiff has failed to demonstrate that it was harmful. Our review of the record reveals that evidence that the defendant failed to perform a "Google search" was cumulative of other evidence indicating he failed to explore the implications of his business partner's demand to change the company's compensation scheme. Indeed, as the trial court itself explicitly noted, the plaintiff was allowed to ask the defendant several times whether he sought any legal or accounting advice regarding that demand. Accordingly, we con-

clude that the plaintiff has failed to demonstrate that the allegedly improper evidentiary ruling was harmful.[10]

D

The plaintiff's final challenge to the court's modification of alimony is that the court abused its discretion in reducing the defendant's alimony obligation for the month of September, 2013. We disagree.

The following additional relevant facts guide our resolution of the plaintiff's final challenge to the court's modification of alimony. As previously set forth, the court properly terminated the plaintiff's periodic alimony effective October 1, 2013. See part I of this opinion. In addition to seeking termination of alimony on that date, the defendant also requested that the court reduce his alimony obligation for the month of September, 2013, from $5000 to $0. Although the court modified the defendant's obligation for that month, it reduced that monthly obligation only by $1000.

As set forth previously, "[o]ur review of a trial court's granting or denial of a motion for modification of alimony is governed by the abuse of discretion standard. . . . To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Trial courts have *broad discretion* in deciding motions for modification." (Citation omitted; emphasis added; internal quotation marks omitted.) *Light* v. *Grimes*, supra, 156 Conn. App. 64. "Trial courts are vested with *broad and liberal discretion* in fashioning orders concerning the type, duration and amount of alimony and support . . . ." (Emphasis added; internal quotation marks omitted.) *Schwarz* v. *Schwarz*, 124 Conn. App. 472, 485, 5 A.3d 548, cert. denied, 299 Con. 909, 10 A.3d 525 (2010).

Mindful of the broad and liberal discretion that a trial court enjoys in fashioning alimony orders, we have no difficulty in concluding that the court's modification of alimony in the present case was not an abuse of discretion. Indeed, the court's modest reduction of alimony by only 20 percent for only one month, the month immediately preceding the termination of alimony, was a proportionate modification under the circumstances of this case. The proportionality of the court's modification is clear in light of that court's finding that the defendant's income during the period for which alimony was modified was approximately 32 percent lower than it was at the time of the dissolution judgment. Furthermore, the court credited the defendant's assertions that he was having difficulty meeting his financial obligations during the period for which alimony was modified. Accordingly, we conclude that the court's modification

of alimony for the month of September, 2013, was not an abuse of discretion.

## III

### MOTIONS FOR CONTEMPT

The plaintiff's final claim is that the trial court improperly denied her motions for contempt. We disagree.

The following additional facts and procedural history are necessary to our resolution of the plaintiff's final claim. The plaintiff filed numerous postjudgment motions for contempt, alleging that the defendant wilfully and intentionally failed to make alimony payments. The motions that are the subject of this appeal are the plaintiff's November 13, 2014 motions for contempt. In one motion, the plaintiff alleged that the defendant wilfully and intentionally failed to pay alimony pursuant to the dissolution judgment. With respect to the dissolution judgment, which required the defendant to pay $5000 per month in alimony, the plaintiff alleged that the defendant had failed to make $85,200 in monthly alimony payments. In the second motion, the plaintiff claimed that the defendant was in contempt of the January, 2013 stipulation, which required him to make monthly payments of $750 toward his stipulated arrearage of $22,000. The plaintiff alleged that the defendant had failed to make $9000 in such payments.

At the hearing, the plaintiff presented evidence that the defendant had paid some, but not all, of his alimony obligations under the dissolution judgment and the January, 2013 stipulation. Specifically, the plaintiff's evidence showed that the defendant had paid, as of November, 2014, $114,950 of his total $144,000 alimony obligation for the period between the dissolution judgment and the termination of alimony on September 30, 2013. According to the plaintiff's calculations,[11] of the $114,950 that the defendant paid, $31,950 was paid between the January, 2013 stipulation and the January 21, 2015 hearing.

Furthermore, as previously explained, on July 30, 2013, the defendant filed a motion for modification of alimony on the ground that his 2013 income was substantially less than his income at the time of the dissolution judgment. Notwithstanding the defendant's claim that the substantial decrease in income prevented him from making full alimony payments, he continued to make partial alimony payments. Indeed, the parties' evidence undisputedly indicated that, with the exception of a few months, the defendant paid *some* alimony in the months preceding and following July, 2013. Specifically, the defendant paid $5700 in February, 2013; $3250 in March, 2013; $750 in April, 2013; $750 in May, 2013; $3750 in June, 2013; $750 in July, 2013; $1000 in August, 2013; $1000 in November, 2013; $1500 in December, 2013; $2000 in January, 2014; $3000 in February, 2014; $300 in April, 2014; $100 in May, 2014; $1400 in

June, 2014; $1000 in September, 2014; $750 in October, 2014; and $150 in November, 2014. The defendant testified that in the months in which he had no income, he relied on loans from his 401 (K) and the overdraft protection feature of his checking account to fund partial alimony payments.

As previously set forth in considerable detail, the court credited the defendant's testimony that he experienced a substantial decrease in his income in 2013. It also credited his assertion that, as a consequence of that decrease, he had difficulty paying alimony and meeting his other financial obligations. Thus, in light of the fact that the defendant attempted to pay some alimony despite the decrease in his income, the court refused to find the defendant in contempt and stated: "With respect to the plaintiff's motions for contempt, the court also concludes that the defendant attempted to pay the alimony and the prior arrearage despite falling behind due to his decreased income by drawing from his retirement account and other assets. The plaintiff has failed to sustain her burden for a finding of contempt . . . ." (Citation omitted.)

With these additional relevant facts in mind, we turn to our analysis of the plaintiff's claim that the court erred in failing to find the defendant in contempt. "Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense." (Internal quotation marks omitted.) *In re Jeffrey C.*, 261 Conn. 189, 196, 802 A.2d 772 (2002). "A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in failing to find that the actions or inactions of the [defendant] were in contempt of a court order. . . . To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt. . . . A finding that a person is or is not in contempt of a court order depends on the facts and circumstances surrounding the conduct. The fact that an order has not been complied with fully does not dictate that a finding of contempt must enter. . . . [It] is within the sound discretion of the court to deny a claim for contempt when there is an adequate factual basis to explain the failure to honor the court's order. . . .

"It is therefore necessary, in reviewing the propriety of the court's decision to deny the motion for contempt, that we review the factual findings of the court that led to its determination. The clearly erroneous standard is the well settled standard for reviewing a trial court's factual findings. A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citations omitted; internal quotation marks omitted.) *Auerbach* v. *Auer-*

*bach*, 113 Conn. App. 318, 326–27, 966 A.2d 292, cert. denied, 292 Conn. 901, 971 A.2d 40 (2009).

Having outlined the relevant law, we turn to the present case. The court's refusal to find the defendant in contempt is predicated on two findings: (1) the defendant experienced a substantial decrease in income in 2013 that prevented him from fully meeting his alimony obligations, and (2) despite that substantial decrease in income, the defendant made partial alimony payments. Thus, the court concluded, on the basis of those two factual findings, that the defendant's nonpayment of alimony was not wilful because there was an adequate factual basis explaining his nonpayment. We already have determined that the first relevant finding supporting this conclusion, the substantial decrease in the defendant's income, is not clearly erroneous. See part II A of this opinion. With respect to the second relevant finding, the defendant's partial payment of alimony, our review of the record leads us to conclude that it, too, is not clearly erroneous. Indeed, the plaintiff's own evidence established that the defendant made, during the period in which his income had substantially decreased, numerous partial alimony payments that totaled nearly $30,000. Moreover, to the extent that the defendant had *no* income at some points during that period, he testified that he relied on other financial resources to fund partial alimony payments. Accordingly, because its determination that the defendant's nonpayment of alimony was not wilful is predicated on findings that are not clearly erroneous, the court did not abuse its discretion in denying the plaintiff's motion for contempt.

The plaintiff argues that, even though the defendant made partial alimony payments, the record reflects that he had the means to make larger payments but wilfully chose not to. Specifically, the plaintiff asserts that there was evidence that the defendant spent money on other expenses while paying only "a fraction" of his alimony obligation. The plaintiff's claim is similar to a claim that we rejected in *Auerbach* v. *Auerbach*, supra, 113 Conn. App. 327–28.

In *Auerbach*, an alimony obligee appealed the trial court's denial of her motion for contempt, claiming that the evidence demonstrated that the obligor's nonpayment of alimony was wilful. Id., 326. Specifically, the obligee argued that the obligor's "conduct . . . was consistent with a higher income than he claimed" and that he had the "ability to comply with the court's orders." Id., 327. The obligee also argued that the wilfulness of the obligor's nonpayment was typified by evidence that he made payments to other creditors and that he "continued his lavish lifestyle and pursued his recreational activities." Id. In affirming the trial court's denial of the obligee's motion, this court reasoned that the trial court could have credited the obligor's testimony that his income declined substantially, that he

had to borrow large sums of money to pay for his children's daily expenses and to meet other financial obligations, and that he was unable to meet his alimony obligations. Id., 327–28. The obligor's testimony, therefore, provided an adequate factual basis explaining his failure to pay alimony: "From the [obligor's] testimony . . . the court reasonably could have concluded that [his] financial situation had so deteriorated that he was unable to comply with [his] . . . alimony . . . obligations . . . ." Id., 328.

The defendant's testimony in the present case, similar to the obligor's testimony in *Auerbach*, indicated that his income decreased substantially, that he had difficulty paying living expenses, such as his mortgage and childcare costs, that he was unable to comply fully with his alimony obligations, and that he ultimately resorted to loans to cover his living expenses and partial alimony payments. The trial court here chose to credit that testimony, which it was entitled to do. Notwithstanding the plaintiff's assertions to the contrary, that testimony, if believed, provided an adequate factual basis establishing that the defendant's nonpayment of alimony was not wilful. See id.

On the basis of the foregoing, we conclude that the court did not abuse its discretion in denying the plaintiff's motions for contempt.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The trial court inadvertently released a decision that was in draft form and that contained mathematical errors and some factual findings that obviously were not part of this case. Following that decision, the plaintiff appealed and filed an appellate brief responding to the trial court's errant memorandum of decision. Before filing his appellate brief, the defendant filed a motion for permission to file a late motion for rectification and articulation, which this court granted. The trial court then issued a corrected memorandum of decision. After the trial court issued a corrected memorandum of decision, the plaintiff filed a motion for review with this court, claiming that the trial court improperly had made substantive changes to its original decision. This court granted the motion for review but denied the relief requested therein. The plaintiff then filed a motion for reconsideration en banc of our denial of the relief requested in her motion for review. This court denied en banc the plaintiff's motion for reconsideration. Following our denial of her motion for reconsideration en banc, the plaintiff did not request permission to file a new or supplemental brief directed at the corrected memorandum of decision. Given the foregoing procedural history and the fact that the plaintiff did not attempt to file a supplemental brief claiming that the court's correction of its decision was improper, the issue of whether the trial court properly corrected its decision is not before us in this appeal. Additionally, because the plaintiff did not file a new or supplemental brief responding to the trial court's corrected decision, we have done our best to consider her claims, as briefed, in light of the corrected decision.

[2] The record reveals that the defendant attempted to amend his July 30, 2013 motion to modify on or around January 5, 2015. That amended motion, which set forth the defendant's claim for termination of alimony on the ground of cohabitation, was not docketed at the time. Indeed, the record reveals that the amended motion was not docketed until February, 2015, which was *after* the January 21, 2015 hearing on the parties' motions. Although the amended motion was not docketed until after that hearing, the defendant had filed on January 13, 2015 a document called, "Proposed Orders and Claims For Relief," which sought termination of alimony on the basis of cohabitation. Additionally, on the day of the January 21, 2015 hearing,

the defendant filed a memorandum of law wherein he argued that alimony should be terminated on the basis of cohabitation. Because the plaintiff did not raise the issue of the amended motion's belated docketing in either the trial court or on appeal, we need not address it further.

[3] "Section 46b-86 (b), known as the cohabitation statute, provides in pertinent part that a court may modify such judgment and suspend, reduce or terminate the payment of periodic alimony upon a showing that the party receiving the periodic alimony is living with another person under circumstances which the court finds should result in the modification . . . of alimony because the living arrangements cause such a change of circumstances as to alter the financial needs of that party." (Internal quotation marks omitted.) *D'Ascanio* v. *D'Ascanio*, 237 Conn. 481, 485–86, 678 A.2d 469 (1996).

[4] The court's statement that the "language of the decree controls" also relates to the issue of "the effective date of th[e] termination." Indeed, the authority cited by the court involved the issue of when termination was effective, not the issue of whether cohabitation occurred. See *Krichko* v. *Krichko*, supra, 108 Conn. App. 648 ("the parties are not disputing *whether* the alimony should have been terminated but, rather, *when* it should have been terminated" [emphasis in original]); *Mihalyak* v. *Mihalyak*, supra, 30 Conn. App. 519 (obligor claimed that trial court should have terminated alimony as of date of cohabitation, not as of date on which obligor filed motion to terminate).

[5] We are not convinced that *Remillard* v. *Remillard*, supra, 297 Conn. 345, compels the conclusion that the dissolution judgment in the present case required evidence of a romantic or sexual relationship to terminate alimony on the basis of cohabitation. As an initial matter, *Remillard* does not purport to explicitly or implicitly overrule *DeMaria*. Indeed, one of the claims on appeal brought by the obligor in *Remillard* was that *DeMaria* was controlling, and, thus, § 46b-86 (b) applied even to a dissolution judgment that did not incorporate the statutory definition of cohabitation. *Remillard* v. *Remillard*, supra, 350–51. Rather than address the merits of that claim, our Supreme Court held that it was unpreserved and unreviewable. Id., 353. Furthermore, there are three crucial distinctions between *Remillard* and the present case. First, unlike in *Remillard*, the parties in the present case did not litigate at all the issue of a romantic or sexual relationship requirement. See id., 348–49. Indeed, neither party raised or argued this issue in any submission to the trial court or at any hearing or oral argument before the trial court. Second, because the issue of a romantic or sexual relationship requirement was never raised in the trial court here, that court never addressed the issue and the parties did not present any evidence of the same. This is in stark contrast to *Remillard*, where the trial court ruled on the romantic or sexual relationship requirement and both parties testified as to their understandings of whether the term "cohabitation" in their separation agreement included such a requirement. Id., 349–50. Third, neither party in *Remillard* urged the trial court to apply the statutory definition of cohabitation; id., 352–53; whereas the plaintiff in the present case appears to have suggested that the court should rely on the definition in § 46b-86 (b). For those reasons, we conclude that *Remillard* does not control the present case.

[6] From the trial court's determination that the defendant's nonpayment of alimony was *excusable*, it is reasonable to conclude that his nonpayment was neither wilful *nor* "*culpable*." See Black's Law Dictionary (10th Ed. 2014) (defining "culpable" as "blameworthy").

[7] We note that, although the parties' January, 2013 stipulation was a post-judgment order, it merely reaffirmed the defendant's periodic alimony obligation as set forth in the 2011 dissolution judgment. Thus, the trial court properly compared the defendant's income at the time of the dissolution judgment to his current income. See *Demartino* v. *Demartino*, supra, 79 Conn. App. 495–96.

[8] Related to the plaintiff's claim that the defendant's neglect caused the substantial change in circumstances is her claim that the court improperly denied her motion for a judgment of dismissal. See Practice Book § 15-8 ("[i]f, on the trial of any issue of fact in a civil matter tried to the court, the plaintiff has produced evidence and rested, a defendant may move for judgment of dismissal, and the judicial authority may grant such motion if the plaintiff has failed to make out a prima facie case"). After the defendant rested, the plaintiff moved for a judgment of dismissal, arguing that the defendant had failed to make out a prima facie case that his own neglect did not cause the substantial change in circumstances. In so arguing, the

plaintiff reserved the right to present her own evidence. The court apparently never ruled on the plaintiff's motion, and she never presented her own evidence. We need not address separately the court's functional denial of the plaintiff's motion for a judgment of dismissal. The plaintiff never presented any of her own evidence, and we would affirm the denial of her Practice Book § 15-8 motion if the defendant had produced evidence "sufficient to raise an issue to go to the trier of fact." (Internal quotation marks omitted.) *Carter* v. *State*, 159 Conn. App. 209, 223, 122 A.3d 720, cert. denied, 319 Conn. 930, 125 A.3d 204 (2015). Thus, because we conclude that the court properly found, *on the basis of defendant's evidence alone*, that the substantial change in circumstances was not caused by the defendant's neglect, then, a fortiori, the defendant produced evidence sufficient to defeat a Practice Book § 15-8 motion.

[9] The plaintiff contends that the court applied the wrong standard by improperly failing to consider whether the defendant's neglect or culpable conduct caused the change in his financial circumstances. As discussed previously in part II B of this opinion, that claim simply is without merit. Indeed, that contention is belied by the court's explicit determination in its corrected memorandum of decision that "the evidence does not support any conclusion that the [defendant's] decrease in income was due to *voluntary or culpable conduct* . . . ." (Emphasis added.)

[10] In precluding testimony on whether the defendant performed a "Google search" regarding his business partner's demand that the company change its compensation scheme, the court also remarked: "I'm not sure whether Google research is reliable or whether this court would consider that." That statement further convinces us that the allegedly improper preclusion of such testimony would not have likely affected the court's ruling. See, e.g., *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 161, 971 A.2d 676 (2009) ("[t]he harmless [impropriety] standard in a civil case is whether the improper ruling would likely affect the result" [internal quotation marks omitted]).

[11] The defendant's own calculations suggest that he paid $2500 *less* than what the plaintiff's calculations suggest he paid. The court ultimately resolved this discrepancy in the plaintiff's favor by adopting the defendant's calculations.

———————————————