******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TRACY M. THOMASI *v.* EDWARD J. THOMASI, SR.
## (AC 39452)
## (AC 39814)

Keller, Prescott and Bishop, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed to this court from certain postjudgment orders of the trial court regarding the division of the defendant's defined benefit pension plan. She claimed that the trial court erred in determining that the term "marital portion," as used in the parties' marital dissolution agreement regarding a division of the defendant's defined benefit pension plan, clearly and unambiguously provided for the coverture method to be utilized in calculating the marital portion. The defendant filed a separate appeal from the trial court's postjudgment orders denying his motion for modification of alimony and interpreting the dissolution agreement to require him to make payments to the plaintiff from his pension plan retroactive to the date of the dissolution. *Held*:

1. The trial court incorrectly determined that the language of the dissolution agreement clearly and unambiguously provided for the coverture method, a fractional calculation, to be utilized to determine the marital portion: although the term marital portion was clear and unambiguous in the sense that the parties agreed to its general meaning, the term nevertheless contained a latent ambiguity under the specific circumstances of this case because the determination of that amount was not self-defining, nor was it defined anywhere else in the agreement, and it could be deduced by using more than one methodology, each of which yielded a significantly different outcome, and although it was not improper for the trial court to hear evidence from the attorney who drafted a domestic relations order as to her normal approach for determining the martial portion of a defined benefit plan when the particular methodology has not been specified to her, the court's focus on that testimony should have been on the attorney's knowledge of the parties' intent in employing the language at issue and whether the parties were aware of her usual practice when referring this matter to her, and the court should have permitted testimony from the parties as to their intentions in employing the language in question; accordingly, the court was legally incorrect in concluding that there was nothing ambiguous about the language used, especially given the attorney's testimony that there is more than one methodology employed to determine the martial portion of a defined benefit pension, and its order regarding the division of the defendant's defined benefit pension plan could not stand.

2. The trial court improperly denied the defendant's motion for a modification of alimony, which was premised on its conclusion that the defendant had caused his loss of employment through his own fault, thereby negating a finding of a substantial change in his financial condition necessary to reduce his alimony obligation; that court's factual conclusion was not supported by the record and was clearly erroneous, as there was insufficient evidence to show that the defendant was fired, rather than mutually separated or laid off, from his employment at a college, and the court's reliance on an unsigned employment separation agreement and a third party's revised complaint involving the defendant as evidence that the defendant caused his own termination of employment was incorrect.

3. The defendant could not prevail on his claim that the trial court erred in interpreting the parties' dissolution agreement to require him to make payments to the plaintiff from his pension plan retroactive to the date of the marital dissolution: the agreement plainly ordered the defendant to immediately transfer one half of the marital portion of his pension plan as of the date of dissolution and did not state that the plaintiff would realize her entitlement only once a domestic relations order was put into place, and, thus, as of the date of the dissolution, the plaintiff was entitled, as her own property, to receive one half of the marital portion of the defendant's monthly pension benefits; nevertheless, the

court should have adjusted the defendant's retroactive payments for any tax liability the defendant incurred for the portion of his pension that was intended for the plaintiff as her share of the marital portion, and, therefore, further proceedings were required to calculate the amount of the defendant's retroactive payment after adjusting for the taxes he paid for the plaintiff's one half of the marital portion.

Argued December 5, 2017—officially released May 15, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven at Meriden and tried to the court, *Klatt, J.*; judgment dissolving the marriage and granting certain other relief; thereafter, the court, *Klatt, J.*, enforced the parties' domestic relations order, and the plaintiff appealed to this court; subsequently, the court, *Klatt, J.*, denied the plaintiff's motion for contempt; thereafter, the court, *Klatt, J.*, denied the defendant's motion to modify alimony, and the defendant appealed to this court; subsequently, the court, *Harmon, J.*, granted the plaintiff's motion for order. *Reversed in part*; *further proceedings*.

*Timothy J. Fitzgerald*, with whom was *Douglas T. Barall*, for the appellant in AC 39452 and appellee in AC 39814 (plaintiff).

*Maria F. McKeon*, for the appellee in AC 39452 and appellant in AC 39814 (defendant).

*Opinion*

BISHOP, J. These appeals arise from the dissolution of marriage between the plaintiff, Tracy M. Thomasi,[1] and the defendant, Edward J. Thomasi, Sr. In AC 39452, the plaintiff appeals from the postdissolution order of the trial court regarding the division of the defendant's defined benefit pension plan. In her appeal, the plaintiff argues that the court erred in determining that the term "marital portion," as used in the parties' marital dissolution agreement regarding a division of the defendant's defined benefit pension plan, clearly and unambiguously provided for the coverture method to be utilized in calculating the marital portion. We conclude that the term, under the limited circumstances of this case, contains a latent ambiguity, and, accordingly, reverse the judgment of the trial court.

In AC 39814, the defendant appeals from the trial court's postdissolution orders denying his motion for alimony modification and interpreting the dissolution agreement to require him to make payments to the plaintiff from his pension plan retroactive to the date of the marital dissolution. On this claim, he makes four arguments that the court erred (1) by finding that he did not experience a substantial change in his financial circumstances justifying a downward modification in his alimony obligation; (2) by declining to consider the plaintiff's receipt of settlement proceeds from a personal injury lawsuit; (3) by improperly taking into consideration his receipt of a pension; and (4) by determining that the dissolution agreement requires him to make pension payments to the plaintiff as of the date of the marital dissolution even though the qualified domestic relations order (QDRO) contemplated by their agreement was not then in place. We agree with the trial court that a fair reading of the agreement requires the defendant to begin making payments from his pension to the plaintiff as of the date of the dissolution. We do not believe, however, that the record supports the court's finding that the defendant's loss of employment was due to his own fault. Accordingly, we reverse in part, and affirm in part, the orders of the trial court.

The following facts pertain to both appeals. The defendant began working for the state of Connecticut in November, 1967, and, as a state employee, he participated in the Connecticut state employees retirement system, which features a defined benefit pension program.[2] The parties were married on April 5, 1991, by which time the defendant had accrued twenty-four years and four months of state service. The defendant retired from state employment on June 1, 2003, after thirty-seven years and six months of service. The marriage of the parties was dissolved on July 22, 2015. Thus, the parties were married for a total of approximately twenty-four years and three months. Although the defendant was employed by the state for a total of

426 months, the parties' marriage spanned 145 months within this period, or approximately 34 percent of the defendant's total period of employment with the state.

As part of the parties' property settlement agreement, paragraph 9B of the dissolution agreement provided: "Husband shall immediately transfer one-half of the marital portion of [h]usband's [s]tate of Connecticut [p]ension [p]lan that is currently in pay status to [w]ife valued as of the date of dissolution and including cost of living over the payment period. This transfer shall be by a QDRO[3] that shall be drafted by Attorney Elizabeth McMahon, with the parties splitting Attorney McMahon's fees equally. The [c]ourt will retain jurisdiction over this entire [p]aragraph to effectuate the intent of the parties." (Footnote added.)

## I

## AC 39452

In this appeal, the parties do not dispute that the term "marital portion" refers to the amount of pension benefit earned during the course of the marriage, and agree that the plaintiff is entitled to one half of that amount. Thus, the term "marital portion" is not patently ambiguous.[4] The question remains, however, whether the term, as used in the parties' marital dissolution agreement, contains a latent ambiguity because there is more than one method for calculating the marital portion of a defined benefit pension.

The following additional facts and procedural history are relevant to the resolution of this appeal. Following the marital dissolution, Attorney McMahon sent a letter dated September 17, 2015, along with a drafted domestic relations order to both parties. In the letter, Attorney McMahon stated in relevant part: "Since the judgment does not specify how to determine the marital portion, I have used a coverture fraction . . . . If this approach is not acceptable to [either party], please let me know and then contact your attorneys for guidance." The September 17, 2015 domestic relations order prepared by Attorney McMahon was signed by the defendant, but not by the plaintiff. On October 26, 2015, Attorney McMahon recirculated a revised domestic relations order, dated September 26, 2015, which corrected a miscalculation in the coverture formula. Later, on December 2, 2015, Attorney McMahon sent a letter to the parties and their prior attorneys stating in relevant part: "The judgment does not specify how the marital portion is to be calculated, and there is more than one way to do so. My role is to craft an order that is consistent with the judgment; I do not advocate for either party. If the parties cannot reach an agreement on their own, they will have to return to court for clarification of the judgment." Pursuant to a request from the defendant's prior counsel, Attorney McMahon drafted a revised domestic relations order on January 11, 2016,

that utilized the subtraction method to calculate the marital portion.

Following the marital dissolution and over a period of several months, the parties, through counsel, exchanged correspondence regarding their disagreement on how to calculate the marital portion of the defendant's pension in accordance with the terms of the marital dissolution agreement, and both parties filed several motions reflecting their disagreement. In conjunction with these exchanges, the plaintiff received a correspondence from the State of Connecticut Retirement Services Division dated December 9, 2014, which had been sent to the defendant.[5] This letter outlined the defendant's participation in the state employees retirement system. The correspondence indicates that as of April 5, 1991, the date of the parties' marriage, the defendant had accrued the right to receive $1833 as a monthly pension benefit upon the normal retirement age of sixty-five. The letter states, as well, that by the time the defendant retired on June 1, 2003, his monthly benefit had risen to $5227.49. As of the date of the parties' marital dissolution, his monthly benefit had risen to $6937.92 due to cost of living increases built into the pension plan. Neither the contents nor accuracy of this letter is disputed by the parties.

A hearing on the parties' motions was scheduled for May 23, 2016. At the hearing, and in response to arguments that there are different methods to calculate the "marital portion" of the defendant's pension benefits, the court stated the following: "[A]s far as the court is concerned, if Attorney McMahon, the person preparing the qualified domestic relations order says the word marital portion is ambiguous to her, [t]hen, I think you have an argument. The bottom line . . . you are going to have to have [Attorney McMahon] in here, to testify, that [the] term is ambiguous." The court further opined that it would not permit testimony from other individuals until it heard from Attorney McMahon.

Consequently, on July 7, 2016, the court heard testimony from Attorney McMahon. She stated that when she first reviewed the dissolution agreement, to her, "marital portion meant one thing. . . . I have seen other approaches in other cases. That's not how I do it. So I didn't see an ambiguity initially, but . . . when a discussion arose and I saw the parties were . . . taking different approaches, then I thought either approach could fit what the judgment [stated]." When the plaintiff's counsel asked Attorney McMahon "if marital portion, standing alone without any further formula or description, was ambiguous," she replied in the affirmative.

On cross-examination by the defendant's counsel, the following exchange occurred:

"Q. [W]hen you get no other instruction from the

court or from the parties or you see the agreement as you did in this, do you . . . normally use the coverture method?

"A. I do.

"Q. Okay. The subtraction method, is that a method you ever use?

"A. Only if it's specified in the judgment."

On that same day, the court issued an order, stating: "The court heard evidence on the motions in limine and finds the contract in the separation agreement is clear and unambiguous regarding [paragraph] 9B, 'marital portion.' The last sentence of the paragraph, the court determines means the enforcement of the signing of the [QDRO] by the parties. The other motions are moot. See transcript . . . for the elaboration of the court's ruling and findings."

The transcript of the July 7, 2016 hearing reveals that the court stated: "I see nothing ambiguous or hear nothing and determine nothing ambiguous about the language. It is the typical language that you see . . . in a situation such . . . as this. . . . [T]estimony from Attorney McMahon established just that, there is nothing ambiguous. The parties agreed to use Attorney McMahon, therefore, they agreed to use her method of calculation and she clearly testified as to what her method of calculation was. Moreover, [paragraph] 9C of the parties' agreement uses the same . . . term, marital portion, and there's no claim of ambiguity there."[6] Finding no ambiguity in the language of the agreement, the court concluded that the September 26, 2015 domestic relations order which employed the coverture method of determining the marital portion of a monthly pension benefit was the appropriate version to be enforced. This appeal followed.

We begin with our standard of review. "It is well established that a separation agreement, incorporated by reference into a judgment of dissolution, is to be regarded and construed as a contract. . . . Accordingly, our review of a trial court's interpretation of a separation agreement is guided by the general principles governing the construction of contracts. . . . A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . If a contract is unambiguous within its four corners, the determination of what the parties intended by their contractual commitments is a question of law. . . . When the language of a contract is ambiguous, [however] the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 354–55,

999 A.2d 713 (2010).

"[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Watkins* v. *Watkins*, 152 Conn. App. 99, 104, 96 A.3d 1264 (2014). "A word is ambiguous when it is capable of being interpreted by reasonably well informed persons in either of two or more senses. . . . Ambiguous can be defined as unclear or uncertain, or that which is susceptible of more than one interpretation, or understood in more ways than one." (Internal quotation marks omitted.) *Flaherty* v. *Flaherty*, 120 Conn. App. 266, 269, 990 A.2d 1274 (2010).

As noted, the plaintiff asserts that she believed the parties intended to calculate the domestic relations order by utilizing the subtraction method. Attorney McMahon testified that determination of the marital portion by this method involves taking "the benefit earned as of the date of marriage and subtract[ing] it from the benefit earned as of the date of divorce. . . . [T]he difference would be what they call the marital portion." See generally E. Brandt, "Valuation, Allocation, and Distribution of Retirement Plans at Divorce: Where Are We?" 35 Fam. L.Q. 469, 476–81 (2001); M. Snyder, "Challenges in Valuing Pension Plans," 35 Fam. L.Q. 235, 249 (2001).

In her postjudgment motions, the plaintiff, using the subtraction method for determining the marital portion of the defendant's pension and the data provided by the State Retirement Services Division, determined that the defendant's pension benefit had increased by $5104.92 (benefit on date of marital dissolution less accrued benefit on date of marriage) and therefore, her marital portion is half that amount, or $2552.46. On the basis of these calculations and by application of the subtraction method, the plaintiff asserted that her share of the defendant's monthly pension benefit as of the date of the marital dissolution should be 36.7 percent of the defendant's total pension equaling $2552.46.

The defendant does not dispute the mathematical consequences of applying the subtraction method for determining the marital portion of a defined benefit pension plan. He disputes only the propriety of utilizing this approach. Thus, it is not disputed that the defendant's premarital monthly pension value was $1833 as

of the date of the marriage and that his pension benefit had risen to $6937.92 as of the date of the marital dissolution. Subtracting the lesser from the greater results in a marital portion of $5104.92, representing the increase in benefit accrued during the course of the marriage. One half of this amount is $2552.46 or 36.7 percent of the total monthly pension payment due to the defendant as of the date of the marital dissolution. As discussed earlier in this opinion, this calculation was reflected in Attorney McMahon's January 11, 2016 domestic relations order draft prepared at the behest of the defendant.[7]

In contrast, the defendant contends that the parties agreed to execute the September 26, 2015 domestic relations order initially drafted by Attorney McMahon, in which she employed the coverture method of determining the marital portion. There, the defendant indicates that Attorney McMahon used "the marital portion of the defendant's [s]tate of Connecticut [p]ension [p]lan calculated using the fraction where the numerator equals the number of months married during the years of employment by the defendant and the denominator equals the total years of credited service for the [defendant's] employment by the [s]tate of Connecticut." Attorney McMahon testified that the determination of the marital portion by this method involves: "[Taking] the years of benefits accrued during the marriage over the total years of benefits accrued as of the date of divorce and then multiply that times the benefit earned as of date of divorce and that would give you the marital portion."[8] Under the coverture fraction, as calculated by Attorney McMahon and recited in her September 17, 2015 letter to the parties, the plaintiff's one half of the marital portion of the monthly pension payment would be $1180.83, or 17.02 percent of the defendant's total pension entitlement as of the date of marital dissolution.[9]

As noted, the different methods of calculation in this instance yield substantially different portions of the pension benefits to the plaintiff. The plaintiff argues that the court erred when it concluded that the language was clear and unambiguous because Attorney McMahon's preferred methodology for determining the marital portion of a pension is not set forth in paragraph 9B of the dissolution agreement. In short, the plaintiff asserts that the court's reference to factors outside of the language utilized in the agreement is a demonstration itself that the language is not clear and unambiguous and is "susceptible to more than one reasonable interpretation." From the record, and notwithstanding the court's conclusion, Attorney McMahon's testimony plainly supports this conclusion. Nevertheless, the defendant maintains that the court properly found that paragraph 9B of the dissolution agreement unambiguously provided for the domestic relations order to be drafted by Attorney McMahon using the coverture frac-

tion on the basis of her testimony that this is the approach she routinely utilizes in drafting pension division orders.

"A latent ambiguity arises from extraneous or collateral facts which make the meaning of a written instrument uncertain although the language thereof be clear and unambiguous. The usual instance of a latent ambiguity is one in which a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally." (Internal quotation marks omitted.) *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 782, 653 A.2d 122 (1995). That is precisely the circumstance the court faced in the case at hand. Here, the ambiguity of the term "marital portion" arises not from the language of the contract itself, but instead from the fact, gleaned from extraneous evidence, that there is more than one method for determining the marital portion of a defined benefit plan. The evidence adduced at the hearing on this issue demonstrates that computations utilizing the two methodologies result in significantly different outcomes in terms of the monthly payments to be received by the nonemployee spouse and, reciprocally, the amount of the monthly benefit to be retained by the employee spouse.

The court determined that the term "marital portion" was unambiguous, not on the basis of the language itself, but on the basis that Attorney McMahon, the expert whose services the parties agreed to effectuate their pension agreement, typically uses the coverture method. Although we conclude that the term "marital portion" is clear and unambiguous in the sense that the parties agree to its general meaning, the term, nevertheless, contains a latent ambiguity under the specific circumstances of this case.

On the basis of our review of the dissolution agreement, we conclude that the trial court incorrectly determined that the language in paragraph 9B is clear and unambiguous. The term "marital portion" of the defendant's pension contains a latent ambiguity because the determination of that amount is not self-defining and can be deduced by using more than one methodology, each of which yields a significantly different outcome. Also, the term "marital portion" is not elsewhere defined in the dissolution agreement. As noted, although Attorney McMahon expressed a preference for utilizing the coverture method for determining the marital portion of a pension, she, with equal clarity, also acknowledged the legitimacy of the use of the subtraction option for making such a determination.[10] Because the term "marital portion" can be reasonably susceptible to more than one method of calculation not specified in the parties' agreement, a latent ambiguity exists in the parties' agreement.

In its decision to rely on extrinsic evidence to resolve the parties' disagreement as to the import of the term "marital portion," the court's focus on Attorney McMahon's usual practice was misplaced. Rather, the task of the court in resolving the ambiguity was to discern the intent of the parties in employing the language at issue.[11] See *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 546 n.17, 791 A.2d 489 (2002) ("[E]xtrinsic evidence may be introduced to clarify the meaning of terms in an integrated contract. . . . Such evidence may not be used, however, once the terms are found to have a clear and unambiguous meaning . . . ." [Citation omitted; emphasis omitted.]). Although it was not inappropriate for the court to hear evidence from Attorney McMahon as to her normal approach for determining the marital portion of a defined benefit plan when the particular methodology has not been specified to her, the focus of this testimony should have been on Attorney McMahon's knowledge of the parties' intent in employing the language at hand and whether the parties were aware of her usual practice when referring this matter to her. The court should also have permitted testimony from the parties as to their intentions in employing the language in question.

And yet, notwithstanding the testimony from Attorney McMahon that there is more than one methodology employed to determine the marital portion of a defined benefit pension, the court concluded that there was "nothing ambiguous about the language" because the parties agreed to use Attorney McMahon. In reaching this conclusion, the court was legally incorrect.[12] Accordingly, the trial court's postjudgment order regarding the division of the defendant's defined benefit pension plan cannot stand.

II

AC 39814

As noted previously in this opinion, in AC 39814, the defendant claims that the court incorrectly denied his motion for alimony modification and interpreted the dissolution agreement to require him to make payments to the plaintiff from his pension plan retroactive to the date of the marital dissolution. We review each of his claims in turn.

At the outset, we note the following additional pertinent facts and procedural history. In her March 18, 2016 motion for contempt, the plaintiff requested, due to the fact that the domestic relations order had not been completed, that the defendant be ordered to make retroactive payments for her portion of his monthly pension benefits effective as of July 22, 2015, the date of the marital dissolution judgment. The court conducted a hearing on September 27, 2016, in which the parties testified and provided argument on the issues of retroactive payments and attorney's fees in response to the

plaintiff's motion. The court issued a memorandum of decision on October 6, 2016, in which it determined that the plaintiff's portion of the defendant's monthly pension benefits "are a property distribution and the amount to be calculated as owed to the plaintiff is to be calculated from the date of dissolution." The court declined to grant either parties' requests for attorney's fees. The court denied the defendant's subsequent motion to reconsider and/or reargue.

Additionally, on June 24, 2016, the defendant filed a motion to modify alimony alleging a substantial change in his circumstances due to a loss of employment. The defendant filed an amended motion to modify alimony on October 24, 2016, additionally alleging that the plaintiff had a significant increase in her income due to her receipt of a settlement stemming from a claim she had made in an unrelated civil litigation. Following a hearing on November 3, 2016, the court determined that because the defendant "was clearly not laid off" and that it was his "own fault that he's no longer employed," his attendant loss of earnings could not be considered in assessing whether he had experienced a substantial change in his financial circumstances. The court further articulated that it considered the defendant's receipt of monthly pension benefits as income. The court determined, as well, that the receipt by each party of certain settlement proceeds from civil litigation should not be considered in assessing whether either had experienced a substantial change in financial circumstances after their marital dissolution because it was "property distribution." Thus, the court denied the defendant's motion to modify alimony in an order dated November 3, 2016. This appeal followed.

A

We first address the court's denial of the defendant's motion to modify alimony. On appeal, the defendant claims that the court incorrectly determined that he caused his own loss of employment and therefore that factor could not be considered in assessing his quest for a reduction of his alimony obligation. The defendant claims, as well, that the court erred in declining to consider the plaintiff's receipt of lawsuit settlement proceeds in assessing whether she had experienced an upward change in her financial circumstances. Finally, the defendant asserts that the court should not have considered his receipt of pension benefits as income for purposes of assessing his motion for a modification of alimony. We conclude that the record does not support the court's conclusion that the defendant caused his own loss of employment through his own fault. Therefore, the court's order denying the defendant's motion for a modification of alimony premised on this conclusion cannot stand.

Our legal principles and standard of review governing the modification of an award of alimony are well estab-

lished. "Our review of a trial court's granting or denial of a motion for modification of alimony is governed by the abuse of discretion standard. . . . To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Trial courts have broad discretion in deciding motions for modification." (Internal quotation marks omitted.) *Spencer* v. *Spencer*, 177 Conn. App. 504, 526, 173 A.3d 1 (2017), cert. granted, 328 Conn. 903, 177 A.3d 565 (2018). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership*, *LLP*, 298 Conn. 495, 507–508, 4 A.3d 288 (2010).

Modification of alimony in this case is governed by General Statutes § 46b-86 (a),[13] and the party seeking the modification has the burden of proving a substantial change in circumstances of either party. *Spencer* v. *Spencer*, supra, 177 Conn. App. 526–27. "When presented with a motion for modification, a court must first determine whether there has been a substantial change in the financial circumstances of one or both of the parties. . . . Second, if the court finds a substantial change in circumstances, it may properly consider the motion and, on the basis of the . . . § 46b-82 criteria, make an order for modification. . . . The court has the authority to issue a modification only if it conforms the order to the distinct and definite changes in the circumstances of the parties. . . . Simply put, before the court may modify an alimony award pursuant to § 46b-86 [a], it must make a threshold finding of a substantial change in circumstances with respect to one of the parties. . . . A finding of a substantial change in circumstances is subject to the clearly erroneous standard of review." (Citation omitted; internal quotation marks omitted.) Id., 527.

"A conclusion that there has been a substantial change in financial circumstances justifying a modification of alimony based only on income is erroneous; rather, the present overall circumstances of the parties must be compared with the circumstances existing at the time of the original award to determine if there

has been substantial change." (Internal quotation marks omitted.) *Coury* v. *Coury*, 161 Conn. App. 271, 283, 128 A.3d 517 (2015). Lastly, "[t]o qualify as a substantial change in circumstances, a change or alleged inability to pay must be excusable and not brought about by the defendant's own fault." (Internal quotation marks omitted.) *Tittle* v. *Skipp-Tittle*, 161 Conn. App. 542, 551, 128 A.3d 590 (2015); see also *Sanchione* v. *Sanchione*, 173 Conn. 397, 407, 378 A.2d 522 (1977) ("'Inability to pay' does not automatically entitle a party to a decrease of an alimony order. It must be excusable and not brought about by the defendant's own fault. There is no way to determine simply from the affidavits and finding what factors the court considered . . . whether his inability to pay was a result of his own extravagance, neglect, misconduct or other unacceptable reason . . . .").

Accordingly, in order to demonstrate a substantial change in financial circumstances, a party seeking a reduction of alimony based on a loss of income has the burden of proving not only the loss of earnings but that the inability to pay "must be excusable and not brought about by the defendant's own fault." (Internal quotation marks omitted.) *Tittle* v. *Skipp-Tittle*, supra, 161 Conn. App. 551. Here, the defendant testified that he was laid off from his position as director of facilities at Albertus Magnus College (college) on April 5, 2016, where he had been earning just over $75,000 per year, and that he has been unable to find employment since then. On cross-examination, the defendant acknowledged that a former coworker had brought a pending civil action against him and the college. As evidence of this claim, the plaintiff filed a copy of the revised complaint in that action. The plaintiff also filed a copy of a proposed separation agreement and letter from the college, dated April 5, 2016, addressed to the defendant. Although a representative of the college signed the separation agreement, the defendant did not. The letter states in relevant part: "This will confirm the discussion that we had today to the effect that your employment with [the college] is terminated as of the close of business today . . . . If you decline to execute the [separate agreement] . . . the [c]ollege's offer to enter into the [separation agreement] will automatically be rescinded as of the close of business on April 26, 2016." The defendant testified that he did not sign the agreement because he "wasn't sure [he] agreed with the severance."[14] Thereafter, the defendant received unemployment compensation for twenty-six weeks. The defendant testified that he has continued to seek employment since being terminated by the college but without success.

The defendant testified that he believes he lost his job because his position was being cut by the college. He further stated that the college did not object to his collection of unemployment, which he understood

would have been unavailable to him had he been fired. In response to plaintiff's counsel's inquiries as to whether he thought he was at fault for the termination of his employment, the defendant asserted that he was not. The defendant also stated that there were no reprimands or criticisms against him in his personnel file at the college.

At the end of the hearing, the court calculated that the defendant received a total gross annual income of $92,560 based upon his social security and pension benefits. The court also stated: "And, quite frankly, I credit the evidence that shows that [the defendant] was clearly not laid off, and I find that [it is] the defendant's own fault that he's no longer employed and making this $75,000 per year. . . . To qualify for a substantial change in circumstances, a change or alleged inability to pay must be excusable and not brought about by the defendant's own fault. I find credible testimony that it clearly was brought about by his own fault. There's evidence of [the college's] letter . . . . There's evidence regarding the revised [c]omplaint. . . . [H]is actions ultimately led to what was clearly . . . an offer to either retire or get fired. He was clearly not laid off as he testified to. So I'm making a finding that any reduction in his income was at the fault of the defendant." The court concluded that the defendant had not met his burden in demonstrating a significant change in financial circumstances as to warrant a modification and, accordingly, denied his motion to modify alimony.

As the party seeking the modification, the defendant had the burden of proving a substantial change in his financial circumstances. It is undisputed that the defendant is no longer employed by the college, resulting in a loss of income of approximately $75,000 per year. Evidence and testimony was presented during the hearing to support this claim. The court also credited the defendant's testimony that he had been actively seeking alternative employment.

In opposition to the defendant's motions to modify alimony, the plaintiff submitted the revised complaint against him and the college, the proposed separation agreement between him and the college, which the defendant never signed, and an accompanying letter. This evidence was proffered to demonstrate that the change in the defendant's circumstances was not excusable because it was brought about by his own fault. Although the court correctly opined that a party who suffers a diminution in earnings through his or her own fault is not thereby entitled to a reduction of an alimony obligation, there was no credible evidence adduced at the hearing on the motion to modify that the defendant, in fact, lost his employment with the college through his own fault.[15] Thus, from our careful review of the record, we conclude that the court's factual conclusion that the defendant caused his discharge from employ-

ment through his own fault finds no support in the record. The court's reliance on an unsigned employment separation agreement and a third party's revised complaint as evidence that the defendant caused his own termination of employment was incorrect. In sum, innuendo aside, whether the defendant was laid off or terminated by the college, there was no evidence presented to the court that the defendant's loss of employment was due to his own fault.

As noted, the defendant testified that his personnel file from the college, which was available during the hearing, contained no reprimands or criticisms regarding his service to the college. The submission of a revised complaint from a former coworker that named the defendant, the college, and others as parties and contained claims for workers' compensation retaliation and infliction of emotional distress, was merely an unproved allegation without any supporting evidence. As such, the mere allegations set forth in this complaint could not suffice as any proof of culpable behavior by the defendant during his employment with the college. Moreover, the complaint contains no allegation that the defendant was terminated due to his own fault.[16]

In response, the plaintiff cites this court's opinion in *Tittle* v. *Skipp-Tittle*, supra, 161 Conn. App. 546, 551, in which a panel of this court determined that evidence showing the party seeking a modification of alimony had been arrested for stalking and for violating a protective order provided a sufficient basis for determining that any change in her financial circumstances had been caused by her own fault. The facts in *Tittle* and those we face in the present case, however, are not parallel. In *Tittle*, the court could reasonably consider the moving party's arrests as evidence of fault, because in order for the arrests to occur an independent magistrate had to have found probable cause of culpable conduct. In the case at hand, however, the court was confronted with mere allegations without any factual support.

In sum, although we recognize it is the duty of a moving party in a motion to modify alimony or support to demonstrate that an inability to pay is not due to his or her own "extravagance, neglect, misconduct or other unacceptable reason"; *Sanchione* v. *Sanchione*, supra, 173 Conn. 407; the court's conclusion in this matter that the defendant was at fault for his loss of employment finds no factual support in the record.

After reviewing the record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Spencer* v. *Spencer*, supra, 177 Conn. App. 513–14. Although the court, as the fact finder, is free to weigh and interpret evidence and determine credibility; see *Watrous* v. *Watrous*, 108 Conn. App. 813, 823, 949 A.2d 557 (2008); there was insufficient evidence to show that the defendant was fired, rather than mutually separated or laid

off, from his employment with the college. Even if we make every reasonable presumption in favor of the court's ruling, the record simply does not support the court's finding that the defendant lost his employment through his own fault. Accordingly, we conclude that the court's determination that the defendant caused his own termination of employment was clearly erroneous as it was not supported by any evidence in the record. Cf. *Bauer* v. *Bauer*, 173 Conn. App. 595, 606, 164 A.3d 796 (2017) (trial court's findings that defendant was not culpable for his termination of employment were supported by record and court concluded that defendant proved substantial change in circumstances).

In conjunction with the court's denial of his motion to modify alimony, the defendant also claims that the court should have considered the plaintiff's receipt of the proceeds from a personal injury claim and the court should not have taken into account his receipt of pension benefits.[17] We are unpersuaded by either claim. As to the plaintiff's receipt of the proceeds from a personal injury claim, the parties dealt specifically with this topic in their marital dissolution agreement. Paragraph 9G states as follows: "Any funds received by either party from his or her pending personal injury law suits shall be retained by that party free and clear from any claim of the other." Because this contingency was provided for in the parties' agreement, it was well within the court's discretion to disregard the plaintiff's subsequent receipt of the anticipated funds. See *Ceddia* v. *Ceddia*, 164 Conn. App. 266, 271, 137 A.3d 830 (2016) ("[a]n appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented" [internal quotation marks omitted]).

Finally, in assessing the defendant's motion to modify alimony, it was appropriate for the court to consider his present overall circumstances in assessing whether he had experienced a substantial change in his financial condition. Accordingly, in taking the defendant's receipt of pension benefits into consideration, the court committed no error.[18] See *Krafick* v. *Krafick*, 234 Conn. 783, 804–806, 663 A.2d 365 (1995); see also *Dinunzio* v. *Dinunzio*, 180 Conn. App. 64, 72–75, A.3d (2018).

Therefore, the court's order denying the defendant's motion for modification of alimony cannot stand and further proceedings are necessary.[19]

B

We next address the issue of whether the court properly determined that the dissolution agreement provided for the plaintiff's receipt of pension benefits from the defendant as of the date of the marital dissolution. The defendant claims that because the dissolution

agreement contemplated the preparation of a domestic relations order to effectuate the parties' pension agreement, the court's order for a division of pension benefits would only become operable once such an order was put in place and that there was no provision in the judgment requiring him to make interim payments. The plaintiff responds that the language of the agreement and judgment provide for her receipt of pension benefits to take place immediately following the judgment and, thus, she is entitled to retroactive payments for the period of time between the date of the dissolution and the effective date of the domestic relations order (gap period).

We restate our standard of review when interpreting the language of a marital dissolution agreement. "If a contract is unambiguous within its four corners, the intent of the parties is a question of law, requiring plenary review. . . . If, however, a contract is ambiguous, the clearly erroneous standard of review is used because the intent of the parties is a question of fact." (Citation omitted.) *Kremenitzer* v. *Kremenitzer*, 81 Conn. App. 135, 140, 838 A.2d 1026 (2004).

The relevant section of the dissolution agreement, paragraph 9B, bears repeating: "Husband *shall immediately transfer* one-half of the marital portion of [h]usband's [s]tate of Connecticut [p]ension [p]lan that is currently in pay status to [w]ife valued as of the date of dissolution and including cost of living over the payment period. This transfer shall be by a QDRO that shall be drafted by Attorney Elizabeth McMahon . . . ." (Emphasis added.)

We are unpersuaded by the defendant's contention that the parties "negotiated the agreement to provide that payments begin after the [domestic relations order] was put in place." The dissolution agreement plainly states that the defendant "shall immediately transfer" one half of the marital portion of his pension plan as of the date of dissolution. The agreement does not state that the plaintiff would realize her entitlement only once the domestic relations order was put in place.

It is well established that pension benefits are a form of property. See *Cifaldi* v. *Cifaldi*, 118 Conn. App. 325, 331, 983 A.2d 293 (2009). In *Cifaldi*, this court opined: "A QDRO is merely an administrative tool used to effectuate the transfer of marital property, in this case pension benefits, from an employee to a nonemployee spouse." Id., 332. "Given the well recognized importance of pension benefits as a piece of marital property, the obvious significance of pension benefits to any property allocation made as part of a dissolution judgment and the expectations of the parties to that judgment, we do not read the parties' agreement . . . to make the vesting of the plaintiff's property interest in a portion of the defendant's pension benefits to be in some way contingent on the successful processing of the QDROs.

To put it simply, we conclude that the plaintiff's property interest in portions of the defendant's pension benefits was not predicated on the processing of paperwork . . . ." (Footnote omitted.) Id., 332–33. The reasoning of *Cifaldi* is applicable to the circumstances at hand. We disagree with the defendant's perspective, in which a party could reduce his or her liability to the other party by simply delaying the processing of the domestic relations order. Accordingly, as of the date of the dissolution, the plaintiff was entitled, as her own property, to receive one half of the marital portion of the defendant's monthly pension benefits. Her entitlement was not contingent on a successfully executed domestic relations order.

The defendant further contends that the court failed to adjust for taxes when it ordered retroactive payments for the gap period. As a result, he asserts that he is required to pay the plaintiff a disproportionate amount from each pension payment because of federal and state tax withholdings. In response, the plaintiff states that "an appropriate tax adjustment can be fashioned" once the marital portion and the dollar amount of the post-judgment payments during the gap period have been calculated, and the defendant establishes the amount of taxes he has already paid. We agree that the defendant's retroactive payments should be adjusted for any tax liability he incurred for the portion of his pension that was intended for the plaintiff as her share of the marital portion. See *Cifaldi* v. *Cifaldi*, supra, 118 Conn. App. 336 ("court could . . . determine the amount of taxes, if any, that the defendant paid on the overpayments he received and reduce the plaintiff's remuneration accordingly").

The court's order regarding the pension is incomplete, as the retroactive amount must be determined once the court determines, after a hearing, the amount due to the plaintiff and then adjusts that amount for taxes the defendant has already paid on the portion to be received by the plaintiff.

In AC 39452, the judgment is reversed and the case is remanded for further proceedings consistent with this opinion. In AC 39814, the court's order denying the defendant's modification of alimony is reversed and the case is remanded for further proceedings according to law; the court's order regarding the pension is reversed in part and the case is remanded for further proceedings consistent with this opinion; the order regarding the pension is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff is now known as Tracy Andreoli.

[2] Generally, a defined benefit pension plan is one in which the periodic benefit to be provided to an employee participant is stated, in plan documents, in terms of a formula based on the employee's earnings, length of employment service and the plan's vesting requirements. In contrast, a defined contribution plan is one which sets forth, in some specified manner, the amount of the employer's periodic contribution to an employee's retire-

ment plan. In sum, one defines the benefit to be received; the other the contribution to be made.

[3] A qualified domestic relations order, or QDRO, is "an order of the court assigning to an alternate payee, in compliance with the Internal Revenue Code, 26 U.S.C. § 414 (p), the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1056 (d) (3), and General Statutes § 46b-81, a portion or all of the benefits payable to a participant in a retirement plan." *Kremenitzer* v. *Kremenitzer*, 81 Conn. App. 135, 136 n.1, 838 A.2d 1026 (2004). A QDRO "is the exclusive means by which to assign to a nonemployee spouse all or any portion of pension benefits provided by a plan that is governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq." (Internal quotation marks omitted.) *Richman* v. *Wallman*, 172 Conn. App. 616, 617 n.1, 161 A.3d 666 (2017).

We note, however, that the procedures set forth in the United States Code for a QDRO do not apply to a governmental pension plan, such as the Connecticut state employees retirement systems. See 29 U.S.C. § 1003 (b) (1). Accordingly, a "qualified domestic relations order" does not apply to the defendant's state government pension plan. Neither the parties nor the court has claimed any impropriety in the characterization of the QDRO in the dissolution agreement; accordingly, we only note the mischaracterization and will refer to the QDRO as a "domestic relations order" in this opinion. See *Bender* v. *Bender*, 258 Conn. 733, 738 n.3, 785 A.2d 197 (2001); accord *Krafick* v. *Krafick*, 234 Conn. 783, 786–87 n.4, 663 A.2d 365 (1995); *Hansen* v. *Hansen*, 80 Conn. App. 609, 612–13 n.2, 836 A.2d 1228 (2003).

[4] "A patent ambiguity is evident on the face of the contract, from the language of the contract itself . . . ." (Footnote omitted.) 17A C.J.S., Contracts § 388 (2018).

[5] We note that the letter states in relevant part: "Please be advised that [the state employees retirement system] is a governmental retirement plan and, as such, is exempt under United States Code, Title 29, Section 1003 from the federal requirements of the Employee Retirement Security Act (ERISA) as they pertain to a Qualified Domestic Relations Order. However, [the state employees retirement system] will divide a member's benefit in recognition of child or spousal support obligations when so ordered by a Connecticut court . . . ." See footnote 3 of this opinion.

[6] Paragraph 9C of the parties' marital dissolution agreement concerns the division of the parties' retirement accounts. There, the parties agreed to equalize the marital portions of their retirement accounts valued as of the date of dissolution by a transfer of a sum certain from the defendant's defined contribution plan to the plaintiff. Because the amount to be transferred was specified, the use of the term "marital portions" in this paragraph is merely descriptive and not operational.

[7] We note that the January 11, 2016 domestic relations order utilizing the subtraction method was requested by the defendant's prior counsel. Furthermore, evidence in the record shows that the defendant's prior counsel gave the calculations to Attorney McMahon via an e-mail correspondence on January 11, 2016.

[8] "The numerator of [the coverture] fraction is the number of months between the commencement of the employee-spouse's employment (or other date on which earning of the subject benefit was commenced) and the date of dissolution. The denominator of the fraction is the total number of months between the commencement of the accumulation of the benefit and the date on which the options first become exercisable, or the pension or other benefit becomes payable. The resulting portion of the total options granted represents the amount earned during the marriage." (Footnote omitted.) A. Rutkin, S. Oldham & K. Hogan, 7 Connecticut Practices Series: Family Law (3d Ed. 2010) § 29:6, p. 608.

For a general discussion on classification, valuation and distribution of pension benefits, see *Krafick* v. *Krafick*, 234 Conn. 783, 663 A.2d 365 (1995). See generally 24 Am. Jur. 2d, Divorce and Separation § 551 (2018) (alternative methods of valuing and distributing pension rights); 27C C.J.S., Divorce § 969 (2018) (valuation and allocation of pensions).

[9] Attorney McMahon divided 145 months (months of service from April 5, 1991 [date of marriage] to June 1, 2003 [retirement date]) by 426 months (months of service from November 27, 1967 [date of employment] to June 1, 2003). This resulted in a marital portion of 34.04 percent, of which one half is 17.02 percent.

[10] Although there are different methods in calculating a marital portion; see, e.g., E. Brandt, supra, 35 Fam. L.Q. 472–81; we note that "there is no set formula that a court must follow when dividing the parties' assets,

including pension benefits." (Internal quotation marks omitted.) *Kent* v. *DiPaola*, 178 Conn. App. 424, 435, 175 A.3d 601 (2017). For a detailed discussion on the coverture fraction and comparison to the present value difference method (subtraction method), see 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6.25, p. 149–63.

A search of other jurisdictions reveals that Washington appellate courts have debated the use of the coverture fraction and subtraction method. See generally *In re Marriage of Rockwell*, 141 Wn. App. 235, 253–54, 170 P.3d 572 (2007), review denied, 163 Wn. 2d 1055, 187 P.3d 752 (2008); *In re Chavez*, 80 Wn. App. 432, 436, 909 P.2d 314, review denied, 129 Wn. 2d 1016, 917 P.2d 576 (1996).

[11] In *Ranfone* v. *Ranfone*, 119 Conn. App. 341, 346, 987 A.2d 1088 (2010), this court affirmed the trial court's application of latent ambiguity to the interpretation of its original pension order in a marital dissolution action. "[L]atent ambiguities are those which appear only as the result of extrinsic or collateral evidence showing that a word, thought to have but one meaning, actually has two or more meanings. . . . Latent ambiguities [can] be shown and explained by pleading and parol proof." (Internal quotation marks omitted.) Id. See also *Kronholm* v. *Kronholm*, 16 Conn. App. 124, 131, 547 A.2d 61 (1988) ("[e]xtrinsic evidence is admissible to assist the court in resolving the question of intent where the terms of a contract are either latently or patently ambiguous").

[12] We leave to the trial court, on remand, the determination of whether the court, in conjunction with resolving the meaning of the term utilized for purpose of the pension division, must then reconsider all of its financial orders under the mosaic doctrine. "Individual financial orders in a dissolution action are part of the carefully crafted mosaic that comprises the entire asset reallocation plan. . . . Under the mosaic doctrine, financial orders should not be viewed as a collection of single disconnected occurrences, but rather as a seamless collection of interdependent elements. Consistent with that approach, our courts have utilized the mosaic doctrine as a remedial device that allows reviewing courts to remand cases for reconsideration of all financial orders even though the review process might reveal a flaw only in the alimony, property distribution or child support awards." (Internal quotation marks omitted.) *Barcelo* v. *Barcelo*, 158 Conn. App. 201, 226, 118 A.3d 657, cert. denied, 319 Conn. 910, 123 A.3d 882 (2015).

"Every improper order, however, does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Citation omitted; internal quotations marks omitted.) Id.

[13] General Statutes § 46b-86 (a) provides in relevant part: "Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support, an order for alimony . . . may, at any time thereafter, be continued, set aside, altered or modified by the court upon a showing of a substantial change in the circumstances of either party . . . . After the date of judgment, modification of any child support order issued before, on or after July 1, 1990, may be made upon a showing of such substantial change of circumstances, whether or not such change of circumstances was contemplated at the time of dissolution. By written agreement, stipulation or decision of the court, those items or circumstances that were contemplated and are not to be changed may be specified in the written agreement, stipulation or decision of the court. . . . If a court, after hearing, finds that a substantial change in circumstances of either party has occurred, the court shall determine what modification of alimony, if any, is appropriate, considering the criteria set forth in section 46b-82."

[14] The defendant further clarified that he signed a different separation agreement, but the college "turned it down." That agreement was not produced as evidence in the course of these proceedings.

[15] See *Schade* v. *Schade*, 110 Conn. App. 57, 65 n.6, 954 A.2d 846 ("[I]f a party's culpable conduct causes an inability to pay an alimony award, then the threshold question of whether a substantial change of circumstances exists is not met. Accordingly, a trial court may not then modify the alimony award."), cert. denied, 289 Conn. 945, 959 A.2d 1009 (2008); see also *Bauer* v. *Bauer*, 173 Conn. App. 595, 600, 164 A.3d 796 (2017) ("The burden of proving an inability to pay rests with the obligor. Whether the obligor has established his inability to pay by credible evidence is a question of fact.

The obligor must establish that he cannot comply, or was unable to do so.").

[16] We take judicial notice that the case in the revised complaint was dismissed on December 6, 2017. *Hardy* v. *Albertus Magnus College*, Superior Court, judicial district of New Haven, Docket No. CV-16-6059830-S. Appellate courts have the authority to take judicial notice of files of the trial court in the same or other cases. *McCarthy* v. *Commissioner of Correction*, 217 Conn. 568, 580 n.15, 587 A.2d 116 (1991); *Disciplinary Counsel* v. *Villeneuve*, 126 Conn. App. 692, 703 n.15, 14 A.3d 358 (2011).

[17] We address the issues in the interest of judicial economy, on the assumption that the issues will likely arise on remand. *Mueller* v. *Tepler*, 312 Conn. 631, 646 n.14, 95 A.3d 1011 (2014).

[18] To the extent that the defendant claims that the court erroneously considered his total pension benefit, which included the plaintiff's marital portion, as part of his financial circumstances in assessing his motion to modify, we agree. On remand, once the court determines the amount of the defendant's defined benefit pension which must be allocated to the plaintiff as her share of the marital portion, that amount may not be considered by the court as part of the defendant's financial circumstances for alimony purposes. See *Krafick* v. *Krafick*, supra, 234 Conn. 804–805 n.26.

[19] We recognize that on remand, the defendant, in order to prove a substantial change in circumstances due to loss of employment, has the burden of proving that his inability to pay must be excusable and not brought about by the his own fault. If the defendant was culpable for his own termination of employment, it would foreclose the threshold determination of a substantial change in circumstances. See *Olson* v. *Mohammadu*, 310 Conn. 665, 674, 81 A.3d 215 (2013) ("in order to meet the threshold of a substantial change in circumstances, the alleged inability to pay must be excusable and not brought about by the defendant's own fault." [internal quotation marks omitted]); see also *Sanchione* v. *Sanchione*, supra, 173 Conn. 407.